NIEMEYER, Circuit Judge:
 

 Following a six-day trial, a jury convicted Quintin Bell of (1) possession with intent to distribute 100 grams or more of heroin, in violation of
 
 21 U.S.C. § 841
 
 (a)(1) ; (2) possession with intent to distribute a quantity of heroin and cocaine base, in violation of
 
 21 U.S.C. § 841
 
 (a)(1) ; (3) possession of a firearm as a felon, in violation of
 
 18 U.S.C. § 922
 
 (g)(1) ; and (4) possession of a firearm in furtherance of a drug-trafficking crime, in violation of
 
 18 U.S.C. § 924
 
 (c)(1)(A). Based on Bell's prior convictions, the district court sentenced Bell to a mandatory minimum sentence of 480 months' imprisonment.
 

 On appeal, Bell contends that the district court erred (1) in denying his motion to suppress statements he made to officers executing a search warrant for his residence; (2) in admitting "other acts" evidence under Federal Rule of Evidence 404(b) ; (3) in denying his motion to disclose the identity of a confidential informant who provided information used to obtain the search warrant; and (4) in enhancing his sentence on the basis of his prior convictions.
 

 For the reasons that follow, we affirm.
 

 I
 

 On April 9, 2014, an ATF task force consisting of federal and state law enforcement officers obtained a "no-knock" warrant from the Circuit Court of Prince George's County, Maryland, to search 5404 Morton Place in Riverdale, Maryland, and to seize from the house any narcotics, firearms, and related items found. The probable cause for the warrant was based on the affidavit of ATF Special Agent Frank Oliver, who had learned from a confidential informant ("CI-1") that Bell was "utilizing the residence to sell and store large quantities of Heroin while armed with a firearm." The warrant application recounted that CI-1 had recently visited Bell's residence and "observed, inside a room of the residence, a firearm and a quantity of heroin, consistent with distribution amounts." It further stated that the informant had been shown a police photograph of Bell and had "positively identified" him as "the individual utilizing [the residence] to sell ... Heroin."
 

 The next morning, April 10, 2014, officers of the Prince George's Police Department made a forced entry into 5404 Morton Place to execute the warrant and, while performing a security sweep, found Bell in the basement and placed him in handcuffs. They led him upstairs to the living room and seated him in a chair near his wife, Stacy Bell ("Stacy"), who had also been handcuffed and seated in a chair. After the house was secured, Agent Oliver
 entered the living room and, knowing that Stacy was the owner of the house, informed her "that [he] had a narcotics search warrant for the home" and then asked her, in the interest of officer safety, "if there [were] any weapons in the house that would hurt an officer." Before Stacy could respond, however, Bell interjected, stating that "there was a gun under the couch" next to them and that "a friend had given him the gun [after] somebody had tried to break into the house and rob him." Officers then searched under the living-room couch and recovered a Mini-14 Ruger semi-automatic rifle.
 

 The ATF task force proceeded to search the house, recovering extensive evidence of drug trafficking. In the basement, where Bell was found, officers found approximately 112 grams of heroin and various drug-trafficking paraphernalia, including a digital scale, empty pill capsules, a capsule-filling device, and bottles of cutting agents. They also found a loaded rifle magazine that was compatible with the Mini-14 Ruger rifle. In the master bedroom upstairs, the officers found in a nightstand several more grams of heroin, another scale, approximately $2,000 in cash, a letter addressed to Bell, and Bell's driver's license. And in a separate bedroom, they found in a filing cabinet approximately $10,000 in cash and a collection of jewelry. Upon completion of the search, the task force released Bell from custody, pursuant to the "request of another [law enforcement] agency."
 

 Some four months later, on August 24, 2014, officers of the Metropolitan Police Department of the District of Columbia ("MPD") received a tip leading them to investigate a parked car in Southeast Washington, D.C. Bell was in the car, accompanied by two others. As the officers approached, Bell opened his door and attempted to exit but was apprehended. The officers found a loaded Glock pistol next to the driver's seat, where Bell had been sitting, as well as approximately $1,000 in cash on Bell's person. They also found several small baggies of marijuana, heroin, and crack cocaine in the car's center console. One baggie containing marijuana was imprinted with green dollar signs, and another baggie containing heroin was imprinted with blue caricatures of a devil's face.
 

 After the MPD officers brought Bell back to the station, a detective advised him of his
 
 Miranda
 
 rights and then interviewed him. During the interview, which was recorded by video, Bell stated that he had been "sharing" the Glock pistol with another man in the car; that the two of them had been "hustlin[g] together" when they were arrested; that he had come to Washington, D.C., that evening to buy "two guns and some coke"; and that, in particular, he was expecting to buy "two Rugers." Bell was charged in the Superior Court of the District of Columbia with several offenses relating to this incident, but the government subsequently decided not to prosecute him in the District of Columbia and dismissed the charges.
 

 Five days later, on August 29, 2014, while Bell was still in custody in Washington, D.C., the ATF task force executed a second search warrant at 5404 Morton Place. Probable cause for this warrant was based on Bell's Washington, D.C. arrest, the evidence from the initial search in April 2014, and CI-1's assertion that Bell was "storing quantities of heroin within [the] residence ... consistent with distribution amounts." During this search, officers found 14 grams of heroin and 3 grams of crack cocaine in the basement, as well as baggies marked with green dollar signs and blue devil faces. Elsewhere in Bell's residence, they again recovered other evidence of drug trafficking, including digital
 scales, bottles of cutting agent, and handgun ammunition hidden inside a crockpot.
 

 In November 2014, a grand jury indicted Bell on four counts for drug trafficking and the illegal possession of a firearm. Bell filed a pretrial motion to suppress the statements he made to Agent Oliver during the April 2014 search of his residence, when he admitted to possession of the Ruger rifle, contending that the statements were obtained in violation of
 
 Miranda
 
 . He also filed a motion to compel disclosure of the identity of CI-1 or, in the alternative, for an
 
 in camera
 
 examination of the informant to determine whether disclosure was warranted. Also prior to trial, the government filed a motion to admit evidence under Federal Rule of Evidence 404(b) of Bell's arrest in Washington, D.C., including the video of his interview.
 

 Following a two-day hearing on these pretrial motions, the district court denied Bell's motion to suppress, stating that Agent Oliver had testified credibly about the April 2014 search; that Oliver had directed his question about weapons in the house to Stacy; and that Bell had then volunteered the answer. The court thus concluded that Bell was not interrogated in violation of
 
 Miranda
 
 . The court also denied Bell's motion to disclose the identity of CI-1, explaining that Bell had failed to meet his burden to pierce the informer's privilege or to obtain an
 
 in camera
 
 examination of the informant that would risk disclosure of his or her identity. Finally, the court granted the government's motion to admit evidence of Bell's arrest in Washington, D.C., concluding that the evidence was reliable and relevant to showing Bell's knowing possession of the rifle and drugs found in his residence and that any prejudice to Bell would be outweighed by the evidence's probative value.
 

 Following trial, the jury convicted Bell on all charges.
 

 The probation officer prepared a presentence report noting Bell's several prior convictions, on which the government relied to argue that he was an "armed career criminal" subject to a 15-year mandatory minimum sentence for his conviction under
 
 18 U.S.C. § 922
 
 (g)(1) (firearm possession as a felon).
 
 See
 

 18 U.S.C. § 924
 
 (e). The report also noted that Bell's conviction under
 
 18 U.S.C. § 924
 
 (c) for possession of a firearm in furtherance of drug trafficking subjected him to a mandatory minimum consecutive sentence of 25 years' imprisonment because he had a prior conviction under § 924(c). Finally, the report classified Bell, based on his prior convictions, as a career offender under U.S.S.G. § 4B1.1. Combining an offense level of 34 and a criminal history Category VI with a second § 924(c) conviction resulted in an advisory Sentencing Guidelines range of 562 to 627 months' imprisonment, and Bell's statutory mandatory minimum sentence was 480 months' imprisonment.
 

 Bell objected to the calculation of his Guidelines sentencing range and to the statutory mandatory minimum sentence, arguing that his predicate convictions did not qualify him as either an armed career criminal or a career offender. He argued further that the statutory mandatory minimum sentences could not constitutionally be applied to him because the fact of his prior convictions had neither been charged in the indictment nor found by the jury beyond a reasonable doubt. The district court rejected Bell's arguments and sentenced him to 480 months' imprisonment.
 

 This appeal followed.
 

 II
 

 Bell contends first that the district court erred in denying his motion to suppress the statements he made on April 10, 2014, during the execution of the first search
 warrant for 5404 Morton Place. During the course of that search and after Agent Oliver asked Bell's wife, Stacy, "if there [were] any weapons in the house that would hurt an officer," Bell interjected that there was a Ruger rifle under the couch. Bell notes that he and Stacy "were being held together, next to each other"; that "it is commonplace for [married] couples to jointly answer questions about matters within their individual knowledge, even when a question is directed only to one of them"; and that Agent Oliver "did not specify whether [Bell] or [Stacy] should respond" to his question. Accordingly, he claims that Agent Oliver's questioning
 
 of Stacy
 
 constituted interrogation
 
 of him
 
 , relying on
 
 Rhode Island v. Innis
 
 ,
 
 446 U.S. 291
 
 ,
 
 100 S.Ct. 1682
 
 ,
 
 64 L.Ed.2d 297
 
 (1980), to argue that, in those circumstances, Oliver "should have known ... that [the questioning] was reasonably likely to elicit an incriminating response from Mr. Bell." Thus, Bell maintains, because he responded to interrogation while in custody without having been given the required
 
 Miranda
 
 warnings, his motion to suppress should have been granted.
 

 At the pretrial hearing, Agent Oliver described the April 10 encounter in some detail, testifying that after he entered the living room from outside the house, he approached Stacy, because she was the owner of the house, and "informed [her]" that the officers had "a narcotics search warrant for the home." He then asked her, out of "concern[ ] for officer safety," "if there [were] any weapons in the house that would hurt an officer." According to Agent Oliver, in posing this question to Stacy, he walked to "[w]ithin a couple feet" of her and "directed [his] question to [her] ... directly," "looking at her in the eye." At the time, Stacy was handcuffed and seated in a chair in the living room. Bell, who was also handcuffed, was seated in "another chair off to the right, behind her chair," and the two chairs were "in close proximity" to each other. After Agent Oliver directed the question to Stacy, however, and before she could answer, Bell stated that "there was a gun under the couch." When the officers looked under the couch, they found the Mini-14 Ruger semi-automatic rifle that, Bell explained, a friend had given him.
 

 The district court accepted Agent Oliver's testimony about the encounter, stating that he credited, as a factual matter, "Agent Oliver's testimony that he did direct the question at Ms. Bell and that the defendant then volunteered an answer." The court thus concluded that although Bell "was in custody, he was not being interrogated" and that his statements were therefore "admissible even though
 
 Miranda
 
 had not been given."
 

 To safeguard the protection against self-incrimination guaranteed by the Fifth Amendment, the Supreme Court in
 
 Miranda
 
 adopted a set of procedural rules that apply when a suspect is subjected to custodial interrogation, including the familiar requirements that he be informed of his "right to remain silent, that any statement he [makes] may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."
 
 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 , 444,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 (1966). And the Court has stated, in applying
 
 Miranda
 
 to circumstances similar to those before us, that "the
 
 Miranda
 
 safeguards come into play whenever a person in custody is subjected to either express questioning or its
 
 functional equivalent
 
 ."
 
 Innis
 
 ,
 
 446 U.S. at 300
 
 ,
 
 100 S.Ct. 1682
 
 . "That is to say, the term 'interrogation' under
 
 Miranda
 
 refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant
 to arrest and custody)
 
 that the police should know are reasonably likely to elicit an incriminating response from the suspect
 
 ."
 
 Id
 
 . at 301,
 
 100 S.Ct. 1682
 
 (emphasis added);
 
 see also
 

 id
 
 . at 301 & n.7,
 
 100 S.Ct. 1682
 
 (explaining that "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect," but that "the intent of the police ... may well have a bearing on" the inquiry).
 

 In
 
 Innis
 
 , the defendant was arrested for a robbery that had been committed hours before with a shotgun.
 
 See
 

 446 U.S. at 293-94
 
 ,
 
 100 S.Ct. 1682
 
 . After Innis received his
 
 Miranda
 
 warnings and invoked his right to counsel, officers took him to the station in a police car, and on the way, he overheard two officers discussing the need to find the shotgun because there was a school for handicapped children located nearby and one of the children could find the gun and hurt himself. Innis interrupted their conversation, stating that he knew where the gun was located, and then led the officers to it.
 
 Id
 
 . at 294-95,
 
 100 S.Ct. 1682
 
 . On those facts, the Supreme Court rejected the Rhode Island Supreme Court's conclusion that Innis's statement was the product of "subtle coercion" equivalent to "interrogation," in violation of
 
 Miranda
 
 .
 
 Id
 
 . at 296, 303,
 
 100 S.Ct. 1682
 
 . The Court noted that the officers had not expressly questioned Innis as they had spoken only to each other.
 
 Id
 
 . at 302,
 
 100 S.Ct. 1682
 
 . And it further concluded that the officers' conversation did not amount to the "functional equivalent" of questioning, as the "entire conversation ... consisted of no more than a few off hand remarks"; that the remarks were not "particularly 'evocative' "; that Innis was not "unusually disoriented or upset at the time"; and that the officers had no reason to believe Innis "was peculiarly [concerned for] the safety of handicapped children."
 

 Id.
 

 at 302-03
 
 ,
 
 100 S.Ct. 1682
 
 . Thus, while recognizing that the officers' remarks presumably subjected Innis to "subtle compulsion," the Court held nonetheless that their conversation did not amount to prohibited interrogation, as "it [could not] be said ... that [the officers] should have known that their conversation was reasonably likely to elicit an incriminating response."
 

 Id.
 

 In this case, as in
 
 Innis
 
 , it is apparent that Bell was subjected to neither express questioning nor its functional equivalent. Agent Oliver focused directly on Stacy as the owner of the house, looked her in the eye, and asked her a single question relating to officer safety - whether there "w[ere] any weapons in the house that would hurt an officer." The question was not posed to Bell and did not seek a response from him, nor was there any evidence that it was intended to. Moreover, nothing in the formulation of the question would suggest that it invited a response from anyone other than Stacy. In short, the record hardly supports Bell's claim that the question, in the circumstances, was likely to elicit from him a statement implicating himself in the illegal possession of a firearm. To be sure, Bell was within earshot, and thus it was within the realm of possibility that he would interject to answer the question. But a conclusion that Agent Oliver
 
 should have known
 
 that his question to Stacy was likely to prompt an incriminatory response from Bell cannot be reconciled with the record before us, including the district court's factual findings, which Bell does not challenge. Nor could such a conclusion be reconciled with the holding of
 
 Innis
 
 .
 

 Innis
 
 's articulation of the
 
 Miranda
 
 rule as applying not only to express questioning but also to its "functional equivalent" reflected the Supreme Court's concern that certain conduct by the police could be designed to have the same coercive effect as
 conventional interrogation. To illustrate, the Court gave as examples several "techniques of persuasion," such as using a "coached witness" to pick the suspect out of a police lineup, or accusing him of a "fictitious crime" in order to induce his confession to the actual crime under investigation.
 
 Innis
 
 ,
 
 446 U.S. at 299
 
 ,
 
 100 S.Ct. 1682
 
 . The
 
 Innis
 
 rule thus encompasses "words or actions ... that the police should know are reasonably likely to elicit an incriminating response,"
 
 id
 
 . at 301,
 
 100 S.Ct. 1682
 
 , but it also recognizes that an officer's conduct does not give rise to " '[i]nterrogation,' as conceptualized in the
 
 Miranda
 
 opinion, [unless it] reflect[s]
 
 a measure of compulsion above and beyond that inherent in custody itself
 
 ."
 
 Id
 
 . at 300,
 
 100 S.Ct. 1682
 
 (emphasis added). Indeed, in applying this standard, the Court emphasized that even though "it may be said" that officers had subjected Innis to "subtle compulsion," that alone was insufficient to qualify the officers' remarks as interrogation.
 
 Id
 
 . at 303,
 
 100 S.Ct. 1682
 
 .
 

 Here too, the record before us falls well short of establishing that Bell was subject to anything beyond the compulsion inherent in custody itself or the "subtle compulsion" accepted in
 
 Innis
 
 . It can hardly be said that overhearing a single question posed to one's spouse creates the necessary level of compulsion without more. To the contrary, the district court found as fact that Bell had "volunteered" his answer to the question directed to Stacy. At bottom, we cannot conclude that Agent Oliver's single question to Stacy resulted in the degree of coercion for it to constitute the functional equivalent of express questioning, as would make Bell's self-incrimination likely enough that Oliver should have foreseen it.
 
 See
 

 Innis
 
 ,
 
 446 U.S. at 301-02
 
 ,
 
 100 S.Ct. 1682
 
 (noting that "the police surely cannot be held accountable for the unforeseeable results of their words or actions");
 
 United States v. Johnson
 
 ,
 
 734 F.3d 270
 
 , 277 (4th Cir. 2013) ("
 
 Innis
 
 rejects [the] possibility [of self-incrimination] in favor of foreseeability").
 

 We therefore affirm the district court's ruling on Bell's motion to suppress.
 

 III
 

 Bell contends next that the district court abused its discretion in admitting evidence about his August 24, 2014 arrest in Washington, D.C., particularly the video of his police interview and the testimony of the MPD officers who arrested Bell relating how Bell was seated next to a Glock handgun and several bags of illegal drugs. Because Bell was not charged for this conduct, the district court admitted the evidence under Federal Rule of Evidence 404(b) as proof that Bell knowingly possessed the drugs and Ruger rifle recovered from the April and August 2014 searches of his Maryland residence. Bell argues that, "as compared to the charged conduct [in Maryland], the [Washington, D.C.] incident involved a different gun and categorically different quantities of drugs found in ... a different context," and thus the evidence could only be relevant to establish his criminal propensity, a prohibited ground for the admission of such evidence under Rule 404(b). He argues further that, even if the evidence had some marginal relevance, it should have been excluded under Rule 403 because "that relevance was vastly overshadowed by the danger of unfair prejudice [to him]."
 

 Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's
 
 character
 
 in order to show that on a particular occasion the person acted in accordance with the character" (emphasis added), but that such evidence may nonetheless be admissible for other purposes, "such as proving motive,
 opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." It is thus a rule of inclusion because it "recognizes the admissibility of prior crimes, wrongs, or acts, with only the one stated exception."
 
 United States v. Queen
 
 ,
 
 132 F.3d 991
 
 , 994 (4th Cir. 1997).
 

 To admit evidence of uncharged crimes under Rules 404(b) and 403, we have held that it must satisfy the following criteria:
 

 (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. ... (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.
 

 Queen
 
 ,
 
 132 F.3d at
 
 997 ;
 
 see also
 

 United States v. Lighty
 
 ,
 
 616 F.3d 321
 
 , 352 (4th Cir. 2010). And the unfair prejudice is not shown merely because the evidence is damaging to a defendant's case, since "highly probative [evidence] invariably will be prejudicial to the defense."
 
 United States v. Basham
 
 ,
 
 561 F.3d 302
 
 , 326 (4th Cir. 2009) (internal quotation marks and citation omitted).
 

 In this case, we readily conclude that the district court did not abuse its discretion in admitting the Washington, D.C. evidence. The video of Bell's police interview - in which he stated that he had been "sharing" the handgun with a companion as they "hustl[ed] together," and that he was expecting to buy "some coke" and "two Rugers" - was plainly necessary and relevant to showing that Bell had, as charged, possessed the Ruger rifle in furtherance of drug trafficking four months earlier. And the MPD officers' testimony, recounting how Bell was arrested with heroin, marijuana, and crack cocaine, packaged in distinctively marked baggies, was similarly probative. Indeed, those same narcotics, and the same baggies, were discovered in Bell's basement the very next week. Rather than merely establishing a propensity to commit crimes, the Washington, D.C. evidence was persuasive proof that Bell had, as alleged in the indictment, knowingly possessed the illegal drugs in his residence with the intent to distribute them and that he had knowingly possessed the Ruger rifle in furtherance of his drug-trafficking activity. Bell's character was not at issue and the evidence was not admitted to prove his character. But intent and motive were at issue, and evidence of both were admissible under Rule 404(b). Finally, Bell makes no claim that the Washington, D.C. evidence was unreliable.
 

 As to Bell's claimed unfair prejudice under Rule 403, nothing in the record suggests that admitting the Washington, D.C. evidence created confusion or tended to subordinate reason to emotion in the jury's factfinding process. Moreover, Bell was notified before trial of the government's intent to use the Washington, D.C. evidence, and the district court gave appropriate limiting instructions to the jury, explaining that the evidence could only be considered to infer his intent to commit the crimes alleged in his indictment.
 
 See
 

 Queen
 
 ,
 
 132 F.3d at 997-98
 
 .
 

 Nonetheless, Bell argues that our decision in
 
 United States v. Hall
 
 ,
 
 858 F.3d 254
 
 (4th Cir. 2017), compels us to reach a contrary conclusion. In
 
 Hall
 
 , the defendant was convicted of possession with intent to distribute marijuana and related firearm offenses after the district court admitted, as evidence of knowledge and intent under
 Rule 404(b), his several prior marijuana convictions. The prior convictions, however, all predated the offenses in Hall's indictment by at least five years, and the government provided
 
 only
 
 the date and statutory citation of each conviction without offering "any [other] information regarding the circumstances giving rise to the convictions."
 

 Id.
 

 at 262
 
 . We held that the district court had abused its discretion because the defendant's criminal history was either irrelevant to the purpose for which it had been admitted or, for certain purposes, so marginally relevant and unduly prejudicial as to violate Rule 403.
 

 Id.
 

 at 268-76
 
 . Our holding in
 
 Hall
 
 , however, is far afield, as the evidence admitted there was the bare fact of the defendant's convictions from more than a half-decade before. In this case, by contrast, the evidence at issue is the defendant's own conduct and statements, which had a close factual and temporal nexus to the crimes charged in the indictment. Bell's reliance on
 
 Hall
 
 is thus unavailing.
 

 We therefore conclude that the district court did not abuse its discretion in admitting the evidence of Bell's arrest in Washington, D.C.
 

 IV
 

 For his final challenge to his conviction, Bell contends that the district court erred in denying his motion to compel disclosure of the identity of the confidential informant who supplied law enforcement with information used to obtain the search warrants for his residence or, in the alternative, to have the district court conduct an
 
 in camera
 
 examination of the informant to determine whether disclosure was warranted. He argues that the crux of his defense was that the contraband at his residence actually belonged to Steven Wise, a heroin addict who assertedly had been living in Bell's basement prior to his death in August 2014. In light of Wise's unavailability as a witness, Bell maintains that he was entitled to pierce the informer's privilege so that he would have an opportunity to examine the informant at trial, as this "could establish that the informant [had] mistakenly identified Mr. Bell [to law enforcement] and that the contraband actually was possessed by Mr. Wise." By denying his motion, Bell argues, the district court foreclosed his ability to offer testimony that was "essential to a fair determination of [his] case."
 

 The district court denied Bell's motion because Bell had failed to meet his "heavy burden to demonstrate the need for identification," as would allow him to pierce the informer's privilege.
 

 The "informer's privilege," which protects a confidential informant's identity, "is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information [about crimes]" to law enforcement.
 
 Roviaro v. United States
 
 ,
 
 353 U.S. 53
 
 , 59,
 
 77 S.Ct. 623
 
 ,
 
 1 L.Ed.2d 639
 
 (1957). In
 
 Roviaro
 
 , the Court declined to adopt a bright-line rule for determining when a defendant may pierce the privilege, stating that the issue instead calls for case-by-case "balancing [of] the public interest in protecting the flow of information [to law enforcement] against the individual's right to prepare his defense."
 

 Id.
 

 at 62
 
 ,
 
 77 S.Ct. 623
 
 . Whether disclosure should be ordered therefore depends "on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."
 

 Id.
 

 And in applying
 
 Roviaro
 
 , we have held more particularly that "the government is privileged to withhold the identity of [an] informant when [he] was a 'mere tipster,' or was used only for obtaining a search warrant, but that failing to
 disclose the informant's identity more likely amounts to error when the informant was
 
 an active participant
 
 in the events leading to the arrest of the accused."
 
 United States v. Gray
 
 ,
 
 47 F.3d 1359
 
 , 1365 (4th Cir. 1995) (emphasis added) (citations omitted).
 

 In this case, we cannot conclude that the district court abused its discretion in refusing to disclose the identity of CI-1, the confidential informant who supplied information used by law enforcement to obtain the two warrants for the search of Bell's residence. Other than providing information for the search warrants - namely, that the informant had recently observed Bell "inside a room of the residence, [with] a firearm and a quantity of heroin ... consistent with distribution amounts" - the informant apparently had no role in Bell's crimes or his prosecution. The informant did not participate in the offenses charged in Bell's indictment, which arose from Bell's possession of narcotics and a firearm at times when the informant was not present, nor was the informant even mentioned to the jury at trial. Moreover, the assertion that the informant might have testified that it was Wise, not Bell, who had stockpiled illegal drugs at Bell's residence - in flat contradiction to the representations in the warrant affidavits - appears dubious, if not entirely speculative. In short, Bell has identified nothing in this case to exempt it from the "well settled principle that the government is permitted to withhold the identity of a confidential informant when 'the informant was used only for the limited purpose of obtaining a search warrant.' "
 
 Gray
 
 ,
 
 47 F.3d at 1365
 
 (quoting
 
 United States v. Poms
 
 ,
 
 484 F.2d 919
 
 , 922 (4th Cir. 1973) ).
 

 We also find no fault in the district court's refusal to convene an
 
 in camera
 
 proceeding to explore this issue further. Under the circumstances, the court was entitled to conclude that any marginal benefit to Bell from such a proceeding would not be worth the added risk of disclosure of the informant's identity.
 

 The cases on which Bell relies to argue that disclosure is nonetheless required are materially distinguishable in that the confidential informants in those cases were intimately involved in the crimes that were to be proved at trial.
 
 See
 

 McLawhorn v. North Carolina
 
 ,
 
 484 F.2d 1
 
 , 6 (1973) (officers used informant to set up a controlled purchase of narcotics from the defendant);
 
 United States v. Price
 
 ,
 
 783 F.2d 1132
 
 , 1139 (4th Cir. 1986) ("[T]he informant in this case did much more than tip off the government. ... [He] set up the deal [and] was a necessary party to the telephone negotiations which led to the attempted [contraband] sale"). In such a case, the defendant has a colorable claim that the informant's identity is necessary to a fair determination of his guilt or innocence.
 
 See
 

 Roviaro
 
 ,
 
 353 U.S. at 64-65
 
 ,
 
 77 S.Ct. 623
 
 . But, as we have explained, Bell cannot make any such claim.
 

 V
 

 In challenging his 480-month prison sentence, Bell contends that, in concluding that he was subject to mandatory minimum sentences based on prior convictions, the district court erred in finding the fact of his prior convictions rather than submitting the issue to the jury. This error, he argues, violated his Sixth Amendment rights.
 

 Bell's argument, however, is foreclosed by the Supreme Court's decision in
 
 Almendarez-Torres v. United States
 
 ,
 
 523 U.S. 224
 
 ,
 
 118 S.Ct. 1219
 
 ,
 
 140 L.Ed.2d 350
 
 (1998), where the Court recognized an exception to the Sixth Amendment that permits a sentencing judge to find the fact of
 a defendant's prior convictions instead of a jury, even when this fact increases the statutory maximum or minimum penalty.
 
 Id
 
 . at 247,
 
 118 S.Ct. 1219
 
 ;
 
 United States v. McDowell
 
 ,
 
 745 F.3d 115
 
 , 123 (4th Cir. 2014). Bell nonetheless argues that the
 
 Almendarez-Torres
 
 exception is "flatly inconsistent" with the Supreme Court's subsequent decision in
 
 Alleyne v. United States
 
 , which held "that facts that increase mandatory minimum sentences must be submitted to the jury."
 
 570 U.S. 99
 
 , 116,
 
 133 S.Ct. 2151
 
 ,
 
 186 L.Ed.2d 314
 
 (2013). The
 
 Alleyne
 
 Court, however, expressly exempted "the fact of a prior conviction" from its holding, leaving intact the "narrow exception" to the Sixth Amendment recognized in
 
 Almendarez-Torres
 
 .
 

 Id.
 

 at 111 n.1,
 
 133 S.Ct. 2151
 
 ;
 
 see also
 

 McDowell
 
 ,
 
 745 F.3d at 124
 
 (noting that "
 
 Almendarez-Torres
 
 remains good law [even after
 
 Alleyne
 
 ], and we may not disregard it unless and until the Supreme Court holds to the contrary").
 

 VI
 

 In challenging his sentence, Bell also contends that the district court erred in relying on prior convictions that did not qualify as predicate offenses to conclude that he was subject to a mandatory minimum sentence of 40 years' imprisonment.
 

 The district court imposed a 40-year mandatory minimum sentence by adding together two components: (1) a 15-year mandatory minimum sentence for his § 922(g)(1) conviction because Bell had at least three prior convictions "for a violent felony or a serious drug offense" under the Armed Career Criminal Act ("ACCA"),
 
 18 U.S.C. § 924
 
 (e)(1) ; and (2) a consecutive 25-year mandatory minimum sentence for his § 924(c) conviction because Bell had a prior § 924(c) conviction,
 
 see
 
 § 924(c)(1)(C)(i), (D). To satisfy the requirement of three qualifying prior convictions under § 924(e)(1), the district court relied on two 1985 Maryland convictions for "robbery with a deadly weapon" and a 1991 federal conviction for "possession with intent to distribute - cocaine base."
 

 Bell's challenge focuses only on the two 1985 Maryland convictions for "robbery with a deadly weapon." He contends that those two convictions do not qualify as predicate convictions under § 924(e) because, as he argues, the offense "does not have as an element the use or threatened use of violent force against a person, as required by the ACCA [ § 924(e) ]," in that "it can be accomplished with force to property, and it can be accomplished with non-violent (
 
 i.e.
 
 , de minimis) force against a person."
 

 Section 924(e) provides that any "person who violates section 922(g) of this title and has three previous convictions ... for a violent felony or a serious drug offense, or both, ... shall be ... imprisoned not less than fifteen years."
 
 18 U.S.C. § 924
 
 (e)(1). The term "violent felony" is defined, as relevant here, as "any crime punishable by imprisonment for a term exceeding one year ... that ... has as an element the use, attempted use, or threatened use of physical force against the person of another."
 
 18 U.S.C. § 924
 
 (e)(2)(B)(i). To determine whether a prior conviction satisfies this definition of a violent felony - known as the "force clause" - we apply the categorical approach.
 
 See
 

 United States v. Reid
 
 ,
 
 861 F.3d 523
 
 , 527 (4th Cir. 2017). Under this approach, we do not look to the facts underlying the prior conviction but must instead determine whether the prior offense
 
 by its elements
 
 involves "the use, attempted use, or threatened use of physical force against the person of another." And the term "physical force," in the context of describing a
 
 violent
 
 felony, entails more than the "mere unwanted touching" necessary
 to prove common law battery,
 
 Johnson v. United States
 
 ,
 
 559 U.S. 133
 
 , 142,
 
 130 S.Ct. 1265
 
 ,
 
 176 L.Ed.2d 1
 
 (2010) ; rather, it is understood to mean "
 
 violent
 
 force - that is, force capable of causing physical pain or injury to another person,"
 

 id.
 

 at 140
 
 ,
 
 130 S.Ct. 1265
 
 .
 

 In determining whether a state offense encompasses the use of such force as an element, we look to state law and "the interpretation of [the] offense articulated by that state's courts."
 
 United States v. Winston
 
 ,
 
 850 F.3d 677
 
 , 684 (4th Cir. 2017) (citations omitted). But the determination of whether the elements of a state offense qualify under the force clause is a question of federal law.
 
 See
 

 Taylor v. United States
 
 ,
 
 495 U.S. 575
 
 , 590-92,
 
 110 S.Ct. 2143
 
 ,
 
 109 L.Ed.2d 607
 
 (1990). As the Supreme Court has stated, "[T]he label a State assigns to a crime ... has no relevance to whether that offense is an ACCA predicate."
 
 Mathis v. United States
 
 , --- U.S. ----,
 
 136 S.Ct. 2243
 
 , 2251,
 
 195 L.Ed.2d 604
 
 (2016) (citing
 
 Taylor
 
 ,
 
 495 U.S. at 590-92
 
 ,
 
 110 S.Ct. 2143
 
 ).
 

 In this case, Bell was twice previously convicted in Maryland state court for "robbery with a deadly weapon." Robbery in Maryland is a common law crime defined as "the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear."
 
 Williams v. State
 
 ,
 
 302 Md. 787
 
 ,
 
 490 A.2d 1277
 
 , 1280 (1985). At the time of Bell's convictions, the offense of common law robbery was incorporated into two provisions of the Maryland Code. The first, Maryland Code, Article 27 § 486 (now repealed), provided:
 

 Every person convicted of the crime of robbery, or as accessory thereto before the fact, shall ... be sentenced to the penitentiary for not less than three nor more than ten years.
 

 And the second, Maryland Code, Article 27 § 488 (now repealed), provided:
 

 Every person convicted of the crime of robbery or attempt to rob
 
 with a dangerous or deadly weapon
 
 or accessory thereto, shall ... be sentenced to imprisonment in the Maryland Penitentiary for not more than twenty years.
 

 As Bell was sentenced to 20 years' imprisonment (with 8 years suspended) for each of his two Maryland robbery convictions, he does not dispute that he was therefore convicted under § 488.
 
 *
 

 Bell contends that despite the two distinctly numbered sections for simple and armed robbery, providing for two distinct punishments, Maryland nonetheless recognizes only one crime of robbery that can be committed with
 
 de minimis
 
 force or with force directed solely against property, either of which would disqualify it as a predicate offense under ACCA's force clause. To make his argument, he relies on statements made by the Maryland Court of Appeals that have described the "dangerous or deadly weapon" component of § 488 as a
 
 sentence enhancement
 
 for the "single common law offense" of simple robbery, as opposed to an
 
 element
 
 of the distinct crime of armed robbery.
 
 E.g.
 
 ,
 
 Whack v. State
 
 ,
 
 288 Md. 137
 
 ,
 
 416 A.2d 265
 
 , 266 (1980) ("In Maryland, robbery is a single common law offense. Article 27, §§ 486 and 488, do not create separate statutory offenses but merely fix the penalties for the one crime of robbery");
 
 accord
 

 Grimes v. State
 
 ,
 
 290 Md. 236
 
 ,
 
 429 A.2d 228
 
 , 231 (1981) ;
 
 but see
 

 Hagans v. State
 
 ,
 
 316 Md. 429
 
 ,
 
 559 A.2d 792
 
 , 799 (1989) (noting that "armed robbery and basic robbery ... [are], for some purposes ... regarded as separate offenses[,] with robbery being the lesser included offense of armed robbery");
 
 Sweetwine v. State
 
 ,
 
 288 Md. 199
 
 ,
 
 421 A.2d 60
 
 , 61 n.1 (1980) (same). Thus, Bell asserts that we cannot consider whether
 
 armed
 
 robbery by its elements satisfies the force clause because it is subsumed within the "single ... offense" of
 
 simple
 
 common law robbery.
 

 Despite what
 
 Whack
 
 and similar Maryland cases have said, however, Maryland uniformly treats the dangerous or deadly weapon component in § 488 as a distinct element of a separate crime, as understood under federal law. The Maryland courts have invariably required the "dangerous or deadly weapon" component to be pled in the indictment and proven to the jury beyond a reasonable doubt.
 
 See
 

 Sweetwine
 
 ,
 
 421 A.2d at
 
 61 n.1 ("[B]ecause armed robbery requires proof of an additional element, the offenses are distinct");
 
 Bynum v. State
 
 ,
 
 277 Md. 703
 
 ,
 
 357 A.2d 339
 
 , 340-41 (1976) (noting separate counts in indictment for simple and armed robbery);
 
 Battle v. State
 
 ,
 
 65 Md.App. 38
 
 ,
 
 499 A.2d 200
 
 , 203 (1985) ("[T]he State must prove
 
 beyond a reasonable doubt
 
 , number one, that there was a robbery, and number two, that it was committed with the use of a deadly or dangerous weapon" (emphasis added) (quoting trial court's jury instructions) );
 
 see also
 

 Wadlow v. State
 
 ,
 
 335 Md. 122
 
 ,
 
 642 A.2d 213
 
 , 216 (1994) ("[R]obbery is ordinarily characterized as one offense, with the division between armed robbery and simple robbery being for the purpose of punishment, ... but the charge must be specific and the determination of the seriousness of the offense is for the trier of fact" (citing
 
 Hook v. State
 
 ,
 
 315 Md. 25
 
 ,
 
 553 A.2d 233
 
 , 236 n.10 (1989) ). And the Maryland pattern jury instructions - in the version applicable during the period when Bell was convicted - similarly made clear that the use of a deadly weapon in a robbery is a separate element to be proved to the jury.
 
 Compare
 
 Md. Crim. Jury Inst. & Comm., § 4.82 (1975) (simple robbery)
 
 with id
 
 . § 4.83 (armed robbery) ("In order for the defendant to be found guilty of [armed robbery], the state must prove beyond a reasonable doubt: (1) that there was a robbery; and (2)
 
 that it was committed with the use of a deadly or dangerous weapon
 
 " (emphasis added) ). Thus, while Maryland has described § 488 as providing for a sentencing enhancement when a deadly weapon is used in a robbery, it has treated the use of a weapon as a separate "element" as that term is understood under federal law. "Elements," after all, "are the 'constituent parts' of a crime's legal definition - the things the 'prosecution must prove to sustain a conviction.' "
 
 Mathis
 
 ,
 
 136 S.Ct. at 2248
 
 (quoting Black's Law Dictionary 634 (10th ed. 2014) ). And when § 488 applies, the defendant's maximum sentence increases from 10 to 20 years' imprisonment.
 
 See
 

 id.
 

 at 2256
 
 (noting, for purposes of the categorical approach, that "[i]f statutory alternatives carry different punishments, then ... they must be elements [as opposed to means]"). Since the determination of whether an offense qualifies under ACCA's force clause is a question of federal law, we conclude that § 488 defined a separate crime, with a separate element and a separate punishment, distinct from simple robbery, which was addressed in § 486.
 

 Thus, the offense of
 
 armed
 
 robbery in Maryland requires the prosecution to prove that the defendant committed (1) "[a] felonious taking and carrying away of the personal property of another from his person by the use of violence or by
 putting in fear," (2) while using a "dangerous or deadly weapon."
 
 Williams
 
 ,
 
 490 A.2d at
 
 1280 ; Md. Code, Art. 27 § 488 (repealed). And for a weapon to qualify as "dangerous or deadly," "the instrument must be (1) designed as 'anything used or designed to be used in destroying, defeating, or injuring an enemy, or as an instrument of ... combat'; (2) under the circumstances of the case, immediately useable to inflict serious or deadly harm ...; or (3) actually used in a way likely to inflict that sort of harm."
 
 Brooks v. State
 
 ,
 
 314 Md. 585
 
 ,
 
 552 A.2d 872
 
 , 880 (1989) (quoting
 
 Bennett v. State
 
 ,
 
 237 Md. 212
 
 ,
 
 205 A.2d 393
 
 , 394 (1964) ). With these elements defined by state law, we readily conclude that, as a matter of federal law, the crime of Maryland armed robbery "has as an element the use, attempted use, or threatened use of physical force against the person of another," in the sense that the force is "capable of causing physical pain or injury,"
 
 Johnson
 
 ,
 
 559 U.S. at 140
 
 ,
 
 130 S.Ct. 1265
 
 , and that therefore it is a violent felony under
 
 18 U.S.C. § 924
 
 (e).
 

 Bell argues nonetheless that Maryland armed robbery could be committed with only
 
 de minimis
 
 force, proffering a hypothetical defendant who "uses an axe to break into a store and then snatches merchandise from the shop owner's hand" or who "use[s] a knife to cut the victim's purse strap [before] yank[ing] it off her shoulder." It is doubtful, to say the least, that those hypotheticals would actually support a conviction under § 488. But more importantly, Bell does not identify any
 
 actual
 
 defendant from a Maryland case who has been prosecuted in such circumstances. Yet, in determining the "minimum conduct" that satisfies a state offense, as the categorical approach requires, we must ensure "there is a 'realistic probability, not [just] a theoretical possibility,' that a State would actually punish that conduct."
 
 United States v. Gardner
 
 ,
 
 823 F.3d 793
 
 , 803 (4th Cir. 2016) (quoting
 
 Moncrieffe v. Holder
 
 ,
 
 569 U.S. 184
 
 ,
 
 133 S.Ct. 1678
 
 , 1684-85,
 
 185 L.Ed.2d 727
 
 (2013) ).
 

 Bell also argues that the force required to commit Maryland armed robbery can be directed solely
 
 against property
 
 , giving the example of a defendant who uses a firearm "to threaten the victim's dog or car," thereby effecting a robbery of the victim without threatening force against his person. In making this argument, Bell relies on
 
 Giles v. State
 
 ,
 
 8 Md.App. 721
 
 ,
 
 261 A.2d 806
 
 , 807 (1970) (stating that the "fear" required to commit common law robbery "may be of injury to the person
 
 or to property
 
 , as for example, a threat to burn down a house" (emphasis added) ), and
 
 Douglas v. State
 
 ,
 
 9 Md.App. 647
 
 ,
 
 267 A.2d 291
 
 , 295 (1970) (same). In
 
 Giles
 
 , however, the court held that there was sufficient evidence to support a finding that the defendant had committed robbery through "actual violence" directed
 
 at the victim's person
 
 , given that the victim had been "grabbed and pushed" during a "tussl[e]."
 
 261 A.2d at 808
 
 . And in
 
 Douglas
 
 , the court affirmed the defendant's robbery conviction for holding up an office clerk, holding that there was no error in a jury instruction stating that robbery by constructive force requires a "threat of violence," rather than "fear of great bodily harm," as the defendant had argued.
 
 267 A.2d at 294-95
 
 . Thus, the actual holdings in those cases - both of which addressed simple, not armed robbery - hardly provide Bell with support. Moreover, the dicta on which Bell relies have apparently never been repeated by any Maryland court in the nearly five decades since
 
 Douglas
 
 and
 
 Giles
 
 were decided.
 

 More importantly, Bell's hypothetical overlooks
 
 the elements
 
 of armed robbery as defined by the Maryland Court of Appeals.
 

 To convict a defendant for armed robbery, the State must prove that he committed (1) "[a] felonious taking and carrying away of the personal property of another
 
 from his person
 
 by the use of violence or by putting in fear," (2) while using a "dangerous or deadly weapon."
 
 Williams
 
 ,
 
 490 A.2d at 1280
 
 (emphasis added); Md. Code, Art. 27 § 488 (repealed);
 
 see also
 

 West v. State
 
 ,
 
 312 Md. 197
 
 ,
 
 539 A.2d 231
 
 , 234 (1988) (explaining that robbery requires "actual" or "constructive" violence; that actual violence "implies
 
 personal
 
 violence"; and that constructive violence is that which "intimidat[es] or plac[es] the
 
 victim
 
 in fear" (emphasis added) (citation omitted) );
 
 Spencer
 
 , 30 A.3d at 898 ("[W]hen considering whether there has been a threat of force or intimidation," a court must "consider whether an ordinary, reasonable person under the circumstances would have been in fear of
 
 bodily harm
 
 " (emphasis added) );
 
 Snowden v. State
 
 ,
 
 321 Md. 612
 
 ,
 
 583 A.2d 1056
 
 , 1059 (1991) ("Robbery is a ... larceny from the person accomplished by either an assault (putting in fear) or a battery (violence)"). Accordingly, Bell's force-to-property hypothetical again does not serve as a persuasive analysis of the elements of Maryland armed robbery.
 
 See
 

 Moncrieffe
 
 ,
 
 569 U.S. at 191
 
 ,
 
 133 S.Ct. 1678
 
 (reaffirming that the categorical approach's "focus on the minimum conduct criminalized by the State statute is not an invitation to apply 'legal imagination' to the State offense" and that there instead "must be 'a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime' " (citation omitted) );
 
 Gonzales v. Duenas-Alvarez
 
 ,
 
 549 U.S. 183
 
 , 193,
 
 127 S.Ct. 815
 
 ,
 
 166 L.Ed.2d 683
 
 (2007) (explaining that to show the requisite "realistic probability," an offender "must at least point to his own case or other cases in which state courts in fact did apply the statute in the special (nongeneric) manner for which he argues").
 

 At bottom, we hold that Bell's two Maryland convictions for robbery with a dangerous or deadly weapon were "violent felon[ies]" as used in § 924(e), and in doing so we join the other Courts of Appeals that have considered this issue and reached the same conclusion.
 
 See
 

 United States v. Redrick
 
 ,
 
 841 F.3d 478
 
 , 485 (D.C. Cir. 2016) ;
 
 United States v. Warren
 
 ,
 
 723 F. App'x 155
 
 , 165 (3d Cir. 2018) (unpublished);
 
 see also
 

 United States v. Segovia
 
 ,
 
 770 F.3d 351
 
 , 355 (5th Cir. 2014) (holding that Maryland armed robbery qualifies under an identical force clause in U.S.S.G. § 2L1.2 ).
 

 While we acknowledge that Bell also challenges the district court's finding under U.S.S.G. § 4B1.1 that he qualified as a career offender by relying on his 1991 District of Columbia conviction for assault with a deadly weapon, in view of our conclusion that Bell's 480-month sentence was a statutory mandatory minimum sentence, any error in the career offender classification would not provide Bell with any relief. We therefore do not reach the issue.
 

 * * *
 

 For the foregoing reasons, we affirm the judgment of the district court.
 

 AFFIRMED
 

 Maryland repealed §§ 486 and 488 in 2002 but generally retained common law robbery and the substance of §§ 486 and 488 in a recodification.
 
 See
 
 Md. Code Crim. Law §§ 3-401(e) (providing that robbery "retains its judicially defined meaning," with certain enumerated exceptions), 3-402 (addressing simple robbery), 3-403 (addressing armed robbery);
 
 see also
 

 Spencer v. State
 
 ,
 
 422 Md. 422
 
 ,
 
 30 A.3d 891
 
 , 895 (2011).