## EDWARD FRANKLIN GILES *v.* STATE OF MARYLAND

[No. 247, September Term, 1969.]

*Decided February 16, 1970.*

722

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Michael Lee Kaplan* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Gary Melick, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Edward Franklin Giles (appellant) was convicted at a non-jury trial in the Criminal Court of Baltimore of robbery charged by the 3rd count of indictment 7357, on which a six-year sentence was imposed, and carrying concealed upon his person a deadly weapon charged by the 1st count of indictment 7358, on which a concurrent sentence of one year was imposed. He contends that the evidence was not sufficient to sustain the convictions. The contention is to be resolved by us by application of the clearly erroneous rule, Maryland Rule 1086.

## ROBBERY

The contention as to the robbery conviction goes to both the *corpus delicti* and the criminal agency of appellant.

## The Corpus Delicti

Appellant claims that the evidence did not establish that the property was stolen from the person of the victim by violence. See *Williams v. State,* 7 Md. App. 683. The violence may be actual, that is by the application of physical force, or constructive, that is by the intimidation or putting in fear of the victim. If there be actual violence it is not necessary that the victim be placed in fear. If there is any injury to the person of the owner, or if he resists the attempt to rob him, and his resistance is overcome, there is sufficient violence to make the taking robbery, however slight the resistance. So "it has been held robbery for a person to seize another's watch or purse, and use sufficient force to break a chain or guard by which it is attached to his person, or to run against another, or rudely push him about, for the purpose of diverting his attention and robbing him, and thus take the property from his person. The fact therefore that surprise aids the force employed to accomplish the taking will not prevent the force from aggravating the offense so as to make it robbery." *Clark & Marshall, Law of Crimes,* 6th Ed., § 12.13, pp. 787-789. If there be a putting of the owner in fear, it is not necessary that there be actual violence. The fear must be reasonable; it must be of such nature as to excite reasonable apprehension of danger, and reasonably to cause the owner to surrender his property. The fear may be of injury to the person or to property, as for example, a threat to burn down a house.[1] *Id.,* § 12.14, pp. 789-793. To constitute robbery, the actual or constructive violence must precede or accompany the taking. See *Perkins, Criminal Law* (1957), pp. 236-239; *Halcomb v. State,* 6 Md. App. 32; *Cornwell v. State,* 6 Md. App. 178.

---

1. As a general rule fear of injury to character or reputation is not sufficient. There is, however, a recognized exception. "If a man threatens to accuse another of an unnatural crime, sodomy, and thereby obtains property from him, the law regards it as robbery, because this offense is so loathsome that the fear of loss of character from such a charge, however unfounded it may be, is sufficient to reasonably induce a man to give up his property." *Clark & Marshall, Law of Crimes, supra,* § 12.14, p. 791.

The victim of the robbery, John Webster, a route salesman for a bakery, testified that he was in his truck preparing to take merchandise into a store at 2900 Springhill Avenue when "I got held up * * * by two men. * * * They wanted my money they told me. * * * Then they took it. * * * Then they left and they told me to sit down in the seat and I sit down in the seat." He said they took cash and checks out of his pockets; "They went through my pockets while I was in the truck and took the money." The court asked why he let them take the money and why he sat on the seat when they told him to do so. He replied, "That's what they told me. * * * Just what they told me, that's what I did." Again asked by the court why he let them take the money he said, "I wasn't going to do anything about it." Asked why not, he said, "I didn't want to." He had no reason why he did not want to; he did not know why he did not object — "I just didn't."

Joseph B. Rabinovitz testified that he saw the truck in front of the store. "There was two men, one inside the truck near the driver, * * * one outside of the truck, about three feet from it." Asked if he saw what was going on inside of the truck, he said, "In exchange of something the Bond Bread man was giving one of the men something. I don't know what he was giving him. But he took it from him and he put it in his pocket." The men then ran down Towanda Avenue. "I saw them run about half a block and, I believe they went into an alley."

Appellant, testifying in his own behalf, admitted being at the scene. On cross-examination he said he saw a boy he knew as Gary in the truck. "I figured something was wrong." Asked why he so figured, he said, "The way he had the man in the truck * * * What reason would he have to be in the truck? I'm quite sure he didn't know this man." It was also elicited from him that he saw Gary grab and push the man in the truck and saw them "tussling."

The trial court found from the evidence that Webster was robbed. It remarked that "Webster was not partic-

ularly helpful in that regard, but a robbery did occur." We believe that the evidence was sufficient to support a determination that the money and checks were taken from Webster by actual violence, particularly in light of appellant's testimony that the victim was grabbed and pushed and he and the man in the truck were "tussling" during the taking. And we feel that in any event it was also sufficient to support a rational inference that the taking was by putting the victim in fear, even though he was not articulate enough or was reluctant to expressly so state. We hold that the court was not clearly erroneous in the judgment on the evidence that the *corpus delicti* of robbery was proved.

## The Criminal Agency of Appellant

When asked, "Who did this to you," Webster said, "I just know it was two of them. The two men, I seen the backs through my mirror when they left." Asked if he saw them in court, he replied, "No," and repeated that answer when asked a second time.

Rabinovitz identified appellant as the one he saw standing outside the truck and who ran away with the man he saw inside the truck. On cross-examination he said he also saw him at a lineup. He was "ninety-nine and three quarters per cent"—"I'll even go seven-eighths" — sure both at the lineup and at trial that appellant was the man he saw beside the truck. See *Logan v. State,* 1 Md. App. 213.

This evidence, with appellant's judicial admission that he was beside the truck as stated by Rabinovitz, established appellant's presence at the scene. The question is whether he was a participant in the robbery.

Appellant testified that he and his wife caught a "hack" [2] to go to the Department of Welfare. On the way his wife said she had forgotten some papers and told the hack to take them back home to get them. While enroute his wife left the car to visit her sister-in-law. Appellant

2. Explained by defense counsel as one who, without a license to operate a cab, transports passengers, apparently for hire.

got the papers and while proceeding to the Department of Welfare, the hack, named Donnie Coates, picked up "this boy named Gary." Gary got out of the car near Springhill Avenue and Towanda Avenue to get his girl friend. It was approaching the time of appellant's appointment at the Department of Welfare and Coates told appellant to see if he could find Gary. "If I didn't see him to come on back, he figured he was trying to get a free ride. * * * I walked up and this boy Gary had Mr. Webster in the truck. As the man, Mr. Rabinovitz said, I was there, I'm not denying that. * * * When I seen what was taking place, I turned around and ran. Then the boy Gary run behind me. So we goes down to the car (Coates' car) and I gets in the car. No, first, the boy Gary got in the car and I was standing there. That's when the police pulled up." Appellant got in the car, it pulled away and went about two or three blocks. "It dawned on me that I ain't done nothing. They got out of the car. That's when I went across the street and stood and waited for the police to come." Gary and Coates ran. He said it was about ten or fifteen minutes before the police got there. He said he knew Coates from seeing him around. Gary's last name was Furby. He did not know the address of either of Gary or Coates.

Officer John Westwood of the Northwest District Police was cruising in an unmarked radio car with a fellow officer in the vicinity of Towanda Avenue at Springhill. He saw a car parked on the northeast corner of Towanda and Keyworth Avenues. A man was in the car, another man approached the car and entered it, sitting in the right-hand side. "The subject here, Mr. Giles, he was standing on the outside of the automobile and I saw him throw a gun underneath the auto while it was still parked at the curb." Appellant entered the car and it "sped north onto Towanda toward Boarman." The officers were unable to stop the car at that time. At the time the officer saw appellant throw the gun under the car "the call for a hold-up in progress at 2900 Springhill Avenue was broadcast over our police radio and that the

two subjects were running north on Towanda Avenue." They pursued the car and found it abandoned at Boarman and Towanda Avenues. Appellant was apprehended about 20 or 30 feet from the car, standing on the curb, looking around. "Mr. Giles had just walked over and stood on the curb. The other two subjects were running down Boarman Avenue toward Reisterstown Road." "Another defendant was apprehended at the end of the block, the third subject disappeared." The vehicle was in the officers' sight at all times. An American Bulldog revolver was recovered from the place where the officer had seen appellant throw it; it was admitted in evidence. There was three dollars and some change in appellant's possession. The record does not show what other personal property was on his person, but he had no weapons. What other personal property he had was turned over to his wife after he was taken to the stationhouse.

The court found that appellant participated in the robbery. It said, "This Court believes that by reason of the defendant running as he did from the truck, getting in the car as Officer Westwood testified, pulling the gun out of his belt, throwing it under the car, that he was not innocently involved." It remarked that if there had been "actual testimony concerning the use of the deadly weapon in the robbery" it "would have no hesitation of finding him guilty" of robbery with a deadly weapon. It rendered a verdict of guilty of robbery. The court made clear that it did not believe appellant's explanations, noting that there was "no corroboration in any part whatsoever of his testimony that he was not a participant, in fact, to the robbery * * * There is no corroboration in any instance of the defense testimony." The weight of the evidence and the credibility of the witnesses were matters for the court as the trier of fact. *Roeder v. State,* 4 Md. App. 705. Appellant's being at the scene of the crime, in the light of the evidence the court found to be credible, supported a determination that it was more than mere presence and it was a rational inference from the circumstances shown that appellant was, at the

least, a principal in the second degree to the robbery. We hold that the court was not clearly erroneous in its judgment on the evidence that appellant was a criminal agent in the robbery. See *Farmer v. State,* 5 Md. App. 546, 553 and cases therein cited.

## DEADLY WEAPON

The count under indictment 7358 of which appellant was convicted alleged, *inter alia* that appellant "unlawfully did wear and carry concealed upon and about his person a certain dangerous and deadly weapon, to wit: a revolver." Code, Art. 27, § 36. The evidence was sufficient to show that appellant did unlawfully carry a revolver upon his person. The question is whether it established that it was concealed. On direct examination the officer only told of the throwing of the gun by appellant. He said nothing about where the gun was before the act of discarding it. He described the clothing of appellant; he was wearing "a brown leather jacket, multicolored orange sweater and orange pants." On cross-examination the officer testified that appellant took the gun from "down inside his belt. * * * He took the gun out of his waistband." There was no other evidence adduced tending to show how appellant carried the gun. He denied even having a gun in his possession.

In summarizing the evidence the court noted that the officer said he saw appellant take the gun "from inside his belt * * * pulling the gun out of his belt." It made no factual findings directly on the question of appellant wearing or carrying the weapon concealed. We do not believe that the evidence directly showed that appellant was carrying the weapon concealed. Nor do we feel that it was a rational inference from the evidence that the weapon was concealed because we cannot say with substantive assurance that such inferred fact was more likely than not to flow from the proved facts on which it was made to depend. See *Leary v. United States,* 89 S. Ct. 1532. Although a showing of absolute invisibility is not required to support a finding that a weapon was

concealed, *Crosby v. State*, 2 Md. App. 578, 583, the evidence here was not such as would support a finding that the gun was concealed from ordinary observation. See *Smith v. State*, 4 Md. App. 128. Compare *Gibbs v. State*, 7 Md. App. 35. We hold that the trial court was clearly erroneous in its judgment on the evidence that appellant was wearing or carrying the weapon concealed upon or about his person.

We cannot determine from the record whether or not additional probative evidence can be produced on a retrial to establish that appellant was carrying or wearing the weapon concealed upon or about his person. We, therefore, feeling that the interests of justice appear to require it, vacate the judgment as to indictment 7358 and remand the case with directions to the trial court (a) to hold a new trial thereon if the State within a time to be specified by the lower court can satisfy the court that it can produce additional probative evidence, or (b) to enter a judgment of acquittal if the State cannot preliminarily so satisfy the court. *Gray v. State*, 254 Md. 385.

> *As to indictment 7357: judgment affirmed;*
> *As to indictment 7358: judgment vacated and case remanded for further proceedings in accordance with this opinion.*