*Joel Adam Dickson v. United States of America*, Misc. No. 7, September Term, 2021.
Opinion by Biran, J.

**CRIMINAL LAW – ROBBERY – THREATS AGAINST PROPERTY AND
CHARACTER –** Answering a certified question from the United States Court of Appeals
for the Fourth Circuit, the Court of Appeals held that neither a threat to harm a person's
property nor a threat to accuse a person of having committed sodomy may form the basis
for a robbery conviction under Maryland law.

U.S. Court of Appeals for the Fourth Circuit
Appeal No. 19-4226
Argued: December 2, 2021

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 7

September Term, 2021

JOEL ADAM DICKSON

v.

UNITED STATES OF AMERICA

*Getty, C.J.
Watts
Hotten
Booth
Biran
Gould
Battaglia, Lynne A.
    (Senior Judge, Specially Assigned),

JJ.

Opinion by Biran, J.

Filed: April 25, 2022

*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

By statute, this Court is authorized to "answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 12-603 (2020 Repl. Vol.). The United States Court of Appeals for the Fourth Circuit has certified the following question to this Court:

> Under Maryland law, can an individual be convicted of robbery by means of threatening force against property or threatening to accuse the victim of having committed sodomy?

As we explain below, the answer to that question is "No."

# I

## Background

Under CJP § 12-605(a), "[t]he court certifying a question of law" to this Court "shall issue a certification order." The certification order must contain "[t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose[.]" *Id.* § 12-606(a)(2). This Court accepts the facts provided by the certifying court. *See, e.g.*, *Price v. Murdy*, 462 Md. 145, 147 (2018). Thus, we adopt the following facts set forth in the certification order of the Fourth Circuit:

> Joel Adam Dickson pled guilty, without a plea agreement, to possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g). In the presentence report ("PSR"), the probation officer assigned Dickson a base offense level of 20, pursuant to U.S. Sentencing Guidelines Manual § 2K2.1(a)(4)(A) (2018), determining that Dickson possessed the firearm after sustaining a felony conviction for a crime of violence, namely his 2007 Maryland robbery conviction. The PSR applied a three-level reduction for acceptance of responsibility, USSG § 3E1.1, for a total offense level of 17. With a total offense level of 17 and placement in criminal history

category V, Dickson's advisory Sentencing Guidelines range was 46 to 57 months' imprisonment. *See* USSG ch. 5, pt. A (sentencing table). Dickson objected to the application of USSG § 2K2.1(a)(4)(A), disputing that his robbery conviction qualified as a crime of violence, and contending instead that his base offense level should be 14 pursuant to USSG § 2K2.1(a)(6).

The district court overruled Dickson's objection and held that Maryland robbery qualified as a crime of violence for purposes of USSG § 2K2.1. There were no other objections to the PSR, and the district court adopted the Guidelines calculations therein. The district court sentenced Dickson to 57 months' imprisonment, a term at the top of his Guidelines range. Dickson timely appealed.

The Fourth Circuit then explained why it was certifying its question concerning Maryland robbery to this Court:

Section 2K2.1(a)(4)(A) establishes a base offense level of 20 for an offense involving unlawful possession of firearms or ammunition if the defendant committed the offense after sustaining a felony conviction for a "crime of violence." The Guidelines define a "crime of violence," in relevant part, as any crime punishable by more than a year in prison that:

> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another ["the force clause"], or
>
> (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, [or] extortion ["the enumerated offenses clause"].

USSG § 4B1.2(a); *see* USSG § 2K2.1 cmt. n.1 (referencing definition of "crime of violence" in USSG § 4B1.2).

Citing decades-old case law from the Court of Special Appeals of Maryland, Dickson argues on appeal that Maryland robbery does not qualify as a crime of violence for purposes of USSG § 2K2.1(a)(4)(A) under either the force clause or the enumerated offenses clause. In *Giles v. State*, the Court of Special Appeals of Maryland stated in dicta that achieving a taking through instilling a fear of injury to property, such as "a threat to burn down a house," is sufficient to qualify the taking as robbery. 261 A.2d 806, 807-08 (Md. Ct. Spec. App. 1970). The Court of Special Appeals of Maryland further stated

2

that instilling a fear of injury to character or reputation generally is not sufficient to qualify a taking as robbery, but that:

> If a man threatens to accuse another of an unnatural crime, sodomy, and thereby obtains property from him, the law regards it as robbery because this offense is so loathsome that the fear of loss of character from such a charge, however unfounded it may be, is sufficient to reasonably induce a man to give up his property.

*Id*. at 808 n.1 (internal quotation marks omitted). The Court of Special Appeals of Maryland has since twice cited *Giles* in dicta for the proposition that robbery includes a taking accomplished by means of instilling in the victim fear of injury to property. *See Douglas v. State*, 267 A.2d 291, 295 (Md. Ct. Spec. App. 1970); *Coles v. State*, 2002 WL 1579567, at * 8 (Md. Ct. Spec. App. Apr. 19, 2002) (unpublished).

If taking by means of instilling fear through threatening force against property or threatening to accuse the victim of sodomy qualifies as Maryland robbery, then Dickson is correct that Maryland robbery does not qualify as a crime of violence under the force clause, because such an offense does not require "the use, attempted use, or threatened use of physical force against the *person* of another." USSG § 4B1.2(a)(1) (emphasis added). To decide whether Maryland robbery aligns with robbery under the enumerated offenses clause, we first consider the generic definition of robbery and then determine whether Maryland robbery is a categoric match to that offense. *United States v. Fluker*, 891 F.3d 541, 547 (4th Cir. 2018). We define generic robbery as "the misappropriation of property under circumstances involving immediate danger to the person." *United States v. Green*, 996 F.3d 176, 181 (4th Cir. 2021) (internal quotation marks omitted). If a taking by means of instilling fear by threatening force against property or threatening to accuse a victim of sodomy qualifies as Maryland robbery, then this state offense does not qualify as a crime of violence under USSG § 4B1.2(a)(2).

We have found no Court of Appeals of Maryland decisions addressing whether Maryland robbery may be accomplished through threatening force against property or by threatening to accuse the victim of having committed sodomy. We therefore respectfully request that the certified question be answered.

3

## II

## Standard of Review

When answering a certified question of law, this Court determines only questions of Maryland law, not questions of fact, and we confine our legal analysis and final determinations of Maryland law to the questions certified. *United Bank v. Buckingham*, 472 Md. 407, 421 (2021); *Fangman v. Genuine Title, LLC*, 447 Md. 681, 690-91 (2016). Indeed, we "may go no further than the question certified." *Price*, 462 Md. at 147 (quoting *AGV Sports Grp., Inc. v. Protus IP Solutions, Inc.*, 417 Md. 386, 389 n.1 (2010)). As we are deciding a question of law, and are not reviewing the decision of a lower court, our analysis necessarily is *de novo*.

## III

## Discussion

Article 5 of Maryland's Declaration of Rights provides that "the Inhabitants of Maryland are entitled to the Common Law of England . . . as [it] existed on the Fourth day of July, seventeen hundred and seventy-six . . . subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State." Md. Const. Declaration of Rights Art. 5(a)(1); *see Gladden v. State*, 273 Md. 383, 389 (1974) ("In 1776 the framers of the Constitution of Maryland adopted the common law [of England] as part of the law of this State.").

Dickson argues that, as of July 4, 1776, it was accepted in English common law that a person could be guilty of robbery if he took a victim's property not just by using or threatening to use force against the person of the victim, but also by threatening force

4

against the victim's property or threatening to accuse the victim of sodomy. Thus, according to Dickson, these two alternative modalities of robbery became part of Maryland's common law through the incorporation of English common law as it existed on July 4, 1776. Dickson further contends that neither the General Assembly nor this Court has ever disclaimed these two modalities of robbery, and that they therefore remain part of Maryland law today.

The Government responds that there was no consensus in English common law as of July 4, 1776, that a robbery could be committed by threatening force against property or by threatening to accuse another of sodomy. But even if those modalities were part of English common law – and therefore became part of Maryland common law in 1776 – the Government argues that this Court in many opinions prior to 2000 defined robbery without mentioning force against property or accusations of sodomy, but rather only referencing the use or threatened use of force against the person. The Government observes that in 2000, the General Assembly for the first time codified a definition of robbery, providing that robbery would retain its "judicially determined meaning, except that a robbery conviction requires proof of intent to deprive another of property" and that robbery "includes obtaining the service of another by force or threat of force." *See* 2000 Md. Laws, Chap. 288.[1] Given this Court's pre-2000 definitions of Maryland robbery, the Government contends that the General Assembly's codification of the "judicially determined meaning"

---

[1] *See Borchardt v. State*, 367 Md. 91, 145-46 n.9 (2001) (describing the 2000 codification of the elements of Maryland robbery).

5

of robbery means that the use or threatened use of force against the person is an essential element of every robbery under Maryland law.

We determine that Maryland robbery has never included alternative modalities based on threats to property or threats to accuse another of sodomy. But even if one or both of these modalities became part of Maryland common law in 1776, this Court subsequently defined the elements of robbery without referencing threats to property or threats to accuse another of sodomy. It was this judicially determined meaning of robbery – which only included the use or the threatened use of force against the person – that the General Assembly codified in 2000.

## A. Robbery Under English Common Law as of July 4, 1776

This Court looks to English common law as it existed on July 4, 1776, when analyzing the elements of common law criminal offenses in Maryland. *See, e.g.*, *Gladden*, 273 Md. at 389. This Court has done so specifically in the context of common law robbery on multiple occasions. *See, e.g.*, *West v. State*, 312 Md. 197, 203-04 (1988); *Spencer v. State*, 422 Md. 422, 429 (2011). Thus, we begin our analysis in this case by examining whether robbery under English common law, as of July 4, 1776, could be committed by way of a threat against a victim's property or a threat to accuse the victim of having committed sodomy.

Under English common law, robbery was defined as a "felonious taking of money or goods of any value from the person of another, or in his presence, against his will, by violence, *or putting him in fear*." 2 WILLIAM OLDNALL RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 61 (2d ed. 1828) (emphasis added). We are concerned

6

here with the meaning of "putting [the victim] in fear" as that phrase was used in describing robbery under English common law prior to July 4, 1776. It is undisputed that putting someone in fear of physical harm could form the basis for a robbery conviction under English common law. What is disputed by the parties is whether, under English common law as it existed on July 4, 1776, a person could commit robbery by putting the victim in fear of something other than physical harm – specifically, fear that their property would be harmed or fear that they would be accused of sodomy. As will be seen, it was not settled under English common law on July 4, 1776, that a person could commit robbery by threatening the victim's property or by threatening to accuse the victim of sodomy.

1. Threats Against Property

Dickson cites one pre-July 4, 1776[2] case, *Rex v. Simons*, in which, he claims, the twelve common law judges of England, known as the "Twelve Judges,"[3] held that robbery

---

[2] The post-July 4, 1776 English robbery cases that Dickson cites provide little, if any, insight concerning the elements of Maryland robbery, as Article 5 of the Declaration of Rights incorporates the "Common Law of England . . . as [it] existed on the Fourth day of July, seventeen hundred and seventy-six." Md. Const. Declaration of Rights Art. 5(a)(1). Any changes to English common law that occurred after July 4, 1776 were not automatically incorporated into Maryland law and thus have no bearing on our analysis in and of themselves. We only consider the post-July 4, 1776 cases to the extent they illuminate the status of English common law robbery as it existed on July 4, 1776.

[3] Prior to the mid-nineteenth century, when a question of law or procedure arose in the course of a criminal jury trial in England, the question could be reserved for consideration by the Twelve Judges. *See* James Oldham, Informal Lawmaking in England by the Twelve Judges in the Late Eighteenth and Early Nineteenth Centuries, 27 Law & Hist. Rev. 181 (2011). If the Twelve Judges thought a defendant's conviction was improper, they would recommend to the Crown that the prisoner be pardoned. *Id.* at 182-83. In 1848, Parliament created the Court for Crown Cases Reserved, which formalized the Twelve Judges' "off-the-record procedure that had been followed for centuries." *Id.* at 181.

could be committed through a threat against the victim's property. Dickson has not directed us to a published opinion in *Simons*, which apparently was tried in 1773; rather, he cites the discussion of *Simons* in a treatise published more than 30 years later, 2 EDWARD HYDE EAST, A TREATISE OF THE PLEAS OF THE CROWN (1806) ("East"). East describes *Simons* as follows:

> One Simons … came with above seventy of his companions to the house of one Thomas Rowe, and said, they would have from him the same as they had had from his neighbours, which was one guinea, else they would tear down his mow of corn and level his house. He gave them a crown to appease them; [Simons] swore he would have 5*s.* more, which Rowe, being terrified, gave him. They then opened a cask of cider by force, and drank part of it, and eat his bread and cheese, and [Simons] carried away a piece of meat. He was indicted for robbing Rowe of 10*s.* in his dwelling-house by assault, and putting him in fear. But there was also another count, for putting [Rowe] in fear, and taking from him in his dwelling-house a quantity of cider, pork, and bread: and it was holden robbery in the dwelling-house.

East at 731.

To begin, we observe that East's discussion of *Simons*, unlike East's account of other cases in his treatise, does not provide any details concerning the reasoning of the Twelve Judges. The account of one trial, bereft of legal analysis, 33 years after the fact, is a thin reed upon which to claim that it was a settled tenet of English common law by July 4, 1776, that robbery could be committed by threatening a person's property.

Moreover, it is not clear that *Simons* involved a threat to property without a concomitant threat to Rowe's person. East's account explains that a mob of more than 70 people appeared at Rowe's house. *Id.* Simons demanded money from Rowe or else the mob would tear down his mow of corn and "level his house." *Id.* Rowe then gave Simons money because he "was terrified." *Id.* After they had the money, Simons and others opened

8

the cask of cider by force and drank part of it, ate some bread and cheese, and then left with some meat. *Id.*

Simons's indictment contained two counts. The first count was for robbing Rowe of money "by assault, and putting [Rowe] in fear." *Id.* The second count was "for putting [Rowe] in fear" and taking the cider, pork, and bread. Because Rowe handed over the money after Simons's threatening statements but before Simons and his cohorts took the victuals, the threat to tear down the corn and level Rowe's house if Rowe did not hand over money necessarily was the basis for the charge of robbery "*by assault*, and putting [Rowe] in fear." (Emphasis added.) Thus, it would appear that a guilty verdict on the first count associated with those threats was based, at least in part, on an underlying assault, i.e., putting Rowe in fear of bodily harm.[4]

In any event, in discussing a case from 1792, *Rex v. Astley*, East makes clear that there was not a consensus in English common law prior to 1792 that robbery could be committed by threatening the victim's property. In *Astley*, the defendants, accompanied by another man who claimed to be the "head of the mob … 2,000 strong," accosted the victim, Grundy, outside Grundy's house near Birmingham. East at 729-30. The head of the mob told Grundy that he needed money to provide something for the mob to drink. If Grundy did not provide "something handsome for his men to drink," Grundy's "house should come

---

[4] The second count of conviction was based on the taking of the food and drink, after Rowe had complied with Simons's demand for money, and following the forcible opening of the cask of cider. A reasonable interpretation of East's account is that the jury found that the second taking was based on Simons having put Rowe in fear by forcibly opening the cask of cider.

down." Grundy said that he might have "9 or 10 guineas," which the head of the mob asked to see. As Grundy was "taking his purse out of his pocket, James Astley told [Grundy] that he might depend upon it that the other man was the head of the mob" and that the other man "was the first man who had entered every house that had been destroyed" during recent riots in Birmingham. *Id.* at 730. East recounted that "Mr. Grundy was so struck with that expression that he immediately took the money out of his purse (9 guineas and a half,) which he gave to the [head of the mob]…" *Id.* Grundy claimed later that he "was greatly alarmed, but not for his person: that when he delivered his money his apprehension was, that if he had refused to do so, the [defendants] would have gone to Birmingham, and have returned with other persons, and pulled down his house and plundered it before he could remove his wife, who was in the house in great agitation." *Id.*

> East continued:

> It was objected on [the defendants' behalf], that there was no evidence of robbery, inasmuch as [Grundy] did not deliver his money from any immediate fear of danger to himself or his property, but from an apprehension of future injury to his house by pulling it down. *And the counsel for the Crown admitting it to be a new case*, Grose J. proposed to have a special verdict found; but on account of the [defendants'] situation, it was agreed that the truth of the evidence should be left to the jury, and if they should find the [defendants] guilty, the judgment should be respited, and the facts submitted to the [Twelve] Judges for their opinion, whether the evidence amounted to robbery.

*Id.* (Emphasis added.)

If the prosecution's theory of robbery based on a threat to pull a victim's house down at a later time was considered a "new case" in 1792, then it necessarily follows that

it was not a settled point of English common law on July 4, 1776, that a threat to property could form the basis for a robbery conviction.

2. Threats to Accuse the Victim of Sodomy

Dickson fares no better in arguing that, as of July 4, 1776, it was settled that robbery could be committed in England by threatening to accuse another of sodomy. As East noted in his 1806 treatise, English common law as of the time of East's writing was still developing with respect to the "nature" of the "fear" that could form the basis for a robbery conviction:

> It remains further to be considered what nature this fear may be. This is an inquiry the more difficult, because it is no where defined in any of the acknowledged treatises upon this subject. Lord Hale proposes to consider what shall be said a putting in fear, but he leaves this part of the question untouched. Lord Coke and Hawkins do the same. Mr. Justice Foster seems to lay the greatest stress upon the necessity of the property's being taken *against the will of the party*, and he lays the circumstance of fear out of the question; or that at any rate when the fact is attended with circumstances of violence or terror, the law *in odium spoliatoris* will presume fear if it be necessary, where there appears to be so just a ground for it. Mr. Justice Blackstone leans to the same opinion. But neither of them afford any precise idea of the nature of the fear or apprehension supposed to exist.

East at 713 (emphasis in original). East found it prudent not to attempt "to draw [an] exact line" on this point, but added,

> thus much I may venture to state, that on the one hand the fear is not confined to an apprehension of bodily injury; and on the other hand it must be of such a nature as in reason and common experience is likely to induce a person to part with his property against his will, and to put him as it were under a temporary suspension of the power of exercising it through the influence of the terror impressed; in which case fear supplies, as well in sound reason as in legal construction, the place of force, or an actual taking by violence, or assault upon the person.

*Id.*

11

East then went on to recount the February 1776 case of *Rex v. Jones*. *See id.* at 714-15; *see also* Proceedings of the Old Bailey, Feb. 21, 1776, available at https://perma.cc/CKU2-KGZS ("*Jones* Old Bailey Report"); 1 Leach 139, 168 Eng. Rep. 171. In *Jones*, the victim (Newman) testified as follows. He came into contact with Jones because the two men were sitting near each other at a playhouse. After the show ended, Jones followed Newman out of the playhouse and into a nearby pub. After drinking beer together, Jones asked Newman what Newman "meant by the liberties he had taken with [Jones's] person at the play-house." East at 714. Newman replied that he knew of none. Jones responded, "D – n you, Sir, but you did," and claimed that others who had been present would "take their oath of it." *Jones* Old Bailey Report. Alarmed by Jones's words, Newman replied that he did not understand what Jones meant, and left the pub soon afterwards. Jones followed Newman out of the pub, told him to "stop," and threatened to "raise a mob about" Newman if Newman "offer[ed] to run." *Id.* Jones then immediately came up to Newman, "seized [Newman's] arm," and said that "this affront is not to be put up with, such an insult is not to be borne, you have offered me an indignity, and nothing can make me satisfaction." *Id.* In "fright," Newman asked Jones what he wanted. Jones replied that Newman "must make [him] a present" of money. With Jones continuously holding Newman by the arm, Newman took "three guineas and some silver" out of his pocket and gave it to Jones. *Id.*

After Jones demanded more money, Newman attempted to leave, but Jones "kept hold of [Newman's] arm and made [him] stand still, which put [Newman] in much fear."

12

*Id.* Newman testified at Jones's trial that he "was fearful [that Jones] had a design of mischief upon [Newman's] person." *Id.* Counsel for the Crown asked Newman: "The threat, as I understand, was that he would raise a mob on account of indecencies?" Newman answered, "Yes," and also answered affirmatively to the question, "Your terror was for fear of being charged with an unnatural crime?" *Id.* There is no indication that Newman testified to having given Jones any more money the next day.

Jones testified in his own defense. Jones claimed that he did not obtain any money from Newman on the night they first met. Rather, Jones testified, Newman tried to "force his hands into [Jones's] breeches" on that night, after which Jones "called out watch several times." *Id.* Newman begged Jones not to report him for the "affront" Newman had given Jones, and offered to make him "a present" if Jones returned to Newman's home the next morning. *Id.* Jones testified that he and a friend did visit Newman's home the next morning. After moving on to a coffeehouse, Newman gave Jones a 10-pound bank note and an additional 40 pounds "in money." Jones testified that he "did not ask a farthing" of Newman. *Id.*

The jury found Jones guilty. East says that the "jury declared that they thought … an accusation [of sodomy] would strike a man with as much or more terror than if he had a pistol at his head." East at 715. However, in the account of the trial available at OldBaileyonline.org, there is no reference to the jury making such a finding. *See Jones* Old Bailey Report. Indeed, it is not clear whether the jury found that Jones robbed Newman of three guineas on the first night they met, or that Jones robbed Newman of more than 40 pounds the next morning at the coffeehouse, or whether he robbed Newman on both

occasions. East says that the Twelve Judges in the Easter term of 1776 "agreed that [Jones's] conviction was proper: for to constitute robbery there was no occasion to use weapons or real violence; but that taking money from a man in such a situation as rendered him not a free man; as if a person so robbed were in fear of a conspiracy against his life or character, was such a putting in fear as would make the taking of his money under that terror a robbery." East at 715. Another secondary source, the barrister Thomas Leach, wrote that the Twelve Judges "were of opinion, that although the money had been obtained in a fraudulent way, and under a false pretence, yet that it was a pretence of a very alarming nature, and a sufficient degree of force had been made use of in effecting it, to constitute the offence of robbery." 1 Leach at 141, 169 Eng. Rep. at 173.

We cannot say, based on *Rex v. Jones*, that it was clear by July 4, 1776, that one could be convicted of robbery in England based on a threat to accuse the victim of sodomy. It is not clear from the various accounts of the trial whether the taking of money occurred immediately after Jones threatened to "raise a mob" and while Jones held Newman physically in his grasp on the first evening they met and/or on the next morning when there was no physical aspect to their interaction. We do not know whether East's statement as to the jury's "declar[ation]" concerning an accusation of sodomy reflects an actual finding of the jury or is only East's interpretative gloss on the proceedings. While the Twelve Judges considered the case, the varying accounts of their opinion by East and Lynch make it impossible to glean anything authoritative from the Twelve Judges' review.

Dickson's citation of the 1763 case of *Rex v. Brown* is similarly unavailing. That case, like *Jones*, involved actual personal violence and fear of personal violence. Brown

14

lured his drunken victim to a waterway, and while the victim was urinating, Brown "violently seized [the victim] by the collar with one hand" and grabbed the victim's penis with the other. Proceedings of the Old Bailey, Sept. 14, 1763, available at https://perma.cc/PT3T-4TR5. Brown then threatened the victim: "I have got you, you are a sodomite, and if you will not immediately consent to give me your money, I will swear that to your charge that shall hang you." *Id.* The victim "pushed back" and "got [Brown's] hand loose from [him]." *Id.* Brown then said, "Make no resistance, young man, I am not unarmed, which put [the victim] in fear of [his] life." *Id.* Brown took the victim's watch, and, while pushing the victim's head against a wall, removed the victim's silver shoe buckles, metal knee buckles, as well as a pair of silver sleeve-buttons, from the victim's person. *Id.* Brown subsequently forced the victim to accompany him to two pubs, where he compelled the victim to give him more money. *Id.* The victim testified that he felt safe at the pub "but not safe from [Brown's] oath that he swore he would lay to my charge." *Id.*

Although Dickson acknowledges that there was evidence of actual and threatened force against the victims in *Brown* and *Jones*, he contends that those decisions did not turn on that evidence. In support, he points to Leach's report of the 1779 case of *Rex v. Donnally*, 1 Leach 193, 168 Eng. Rep. 199, in which Leach cited *Brown* and *Jones* as support for *Donnally*'s holding that the defendant committed robbery by threatening to bring the victim before a magistrate on the charge of sodomy. However, Leach noted that *Brown* and *Jones* (as well as a third case, *Rex v. Harrold*) all were different than *Donnally* in that "some actual violence was proved, as taking and seizing by the arm or collar."

15

1 Leach at 199, 168 Eng. Rep. at 202.[5] Whether or not Leach, and for that matter the Twelve Judges in *Donnally*, believed that *Brown* and *Jones* supported the notion that a threat to accuse someone of sodomy without any concomitant use of physical force or threat of force could form the basis for a robbery conviction, it is impossible to say that *Jones* and *Brown* were decided on that basis.

With the advent of *Donnally* in 1779, English common law seemingly accepted the sodomy theory of robbery. However, Maryland law did not incorporate *Donnally*'s holding as part of its common law. July 4, 1776 was a fork in the road. English common law established on or before that date became part of Maryland's common law. English cases decided after July 4, 1776, such as *Donnally*, are not part of the road upon which Maryland law traveled following American independence. When Maryland incorporated English common law on July 4, 1776, it was not yet established under English law that a threat to

---

[5] Dickson's citation to *Rex v. Morgan*, *see* Proceedings of the Old Bailey, Apr. 13, 1774, available at https://perma.cc/ES6Z-ZBW3, fails for a similar reason. In *Morgan*, the defendant was indicted for "putting [the victim] in corporal fear and danger of his life, and taking from his person, eleven half-pence and two farthings, the property of the [victim]." *Id.* The victim testified that Morgan had "laid hold" of him and "said if I did not lend it [to] him he would blow my brains out." *Id.* The victim further testified that Morgan "put his hand on my breeches pocket and said here is money; then he put his hand in my waistcoat pocket and took out the half-pence and ran away." *Id.* The defendant also "said he would charge [the victim] with sodomitical practices," *id.*, but the presence of both a threat of force against the victim and the actual use of force to take the property, makes it impossible to conclude that Morgan's conviction was based on the threat to accuse the victim of sodomy.

accuse someone of sodomy, without more, could subject the alleged wrongdoer to a conviction for robbery.[6]

------------------------

Notably, we have located no Maryland treatise from the late eighteenth century or the nineteenth century that recognized either of the proffered nonviolent theories of robbery as existing under Maryland law. To the contrary, in his 1826 treatise, John Latrobe defined robbery as an "[o]pen *and violent* larceny from the person," and listed the elements of robbery as the "felonious and forcible taking from the person of another, of goods or money to any value, by violence, or putting him in fear." John Latrobe, JUSTICE'S PRACTICE UNDER THE LAWS OF MARYLAND 284 (1826) (emphasis added). Thus, Latrobe understood robbery to involve violence. It follows that when Latrobe referred to "putting in fear," he meant putting in fear of violence.

Sixty-three years after Latrobe published his treatise, Lewis Hochheimer reiterated that "[r]obbery is larceny committed by violence from the person of one put in fear." Lewis

---

[6] We acknowledge that the Supreme Court of Virginia reached a different conclusion with regard to *Jones* when it recently considered its own certified question from the Fourth Circuit. *See White v. United States*, 863 S.E.2d 483, 487-92 (Va. 2021). However, the Court recognized that its interpretation of *Jones* was not "incontestable." *Id.* at 492; *see also id.* at 492-93 (Mims, J., concurring in the result) (opining that the "sodomy exception" was not first applied in England until after 1776). The Court ultimately based its holding that Virginia robbery encompasses a threat to accuse the victim of sodomy on four prior opinions of the Virginia Supreme Court, dating between 1890 and 1938, in which the Court accepted that proposition. *See id.* at 492 (citing cases). The Court also noted that "Virginia's earlier legal treatises confirm our understanding of this common-law robbery doctrine." *Id.* at 484-85 (citing treatises published in 1810, 1838, and 1860). As discussed below, there are no cases of this Court that have recognized the "sodomy exception" to be part of Maryland common law, and nineteenth century Maryland treatises also suggest that this exception was not understood to exist in Maryland.

17

Hochheimer, A MANUAL OF CRIMINAL LAW, AS ESTABLISHED IN THE STATE OF MARYLAND 174 (1889) (footnote omitted). He continued: "Force means either actual violence or overcoming resistance by exciting a reasonable apprehension of danger." *Id.* Most pertinent to the question before us, Hochheimer observed: "Threats of prosecution do not legally constitute a putting in fear." *Id.* Citing Wharton's criminal law treatise,[7] which, in turn, cited the same English cases that we have discussed above as well as other non-Maryland cases, Hochheimer wrote: "Some cases have held that to extort money under a threat of charging a person with an unnatural crime is robbery, but this ruling is not in accord with sound principle." *Id.* (footnotes omitted).

If Dickson was correct that it was settled as a matter of English common law on July 4, 1776, that threats to property and threats of accusations of sodomy were sufficient to form the basis for a robbery conviction, we think that Latrobe and Hochheimer would have specified that "putting in fear" for purposes of Maryland robbery could include putting the victim in fear of property loss or of being accused of sodomy. Instead, Latrobe and Hochheimer described robbery as a violent form of larceny from the person, and Hochheimer specifically disclaimed the theory of robbery based on a threat to accuse the victim of an "unnatural crime."

In sum, we agree with the Government that neither of the alternate modalities of robbery proffered by Dickson became part of Maryland law through the incorporation of English common law as of July 4, 1776.

---

[7] Francis Wharton, A TREATISE ON CRIMINAL LAW (8th ed. 1880).

## B. The "Judicially Determined Meaning" of Robbery under Maryland Common Law and the Codification of Robbery's Definition in 2000

Even if we agreed that the theories of robbery advanced by Dickson were incorporated into Maryland common law as of July 4, 1776, our inquiry would not end there. Rather, we would need to examine whether the elements of robbery under Maryland had changed since 1776. Since at least 1821, this Court has recognized and exercised its power to interpret, define, and amend the common law of Maryland, even when the exercise of this power results in a departure from English common law doctrine as it existed on July 4, 1776. *State v. Buchanan*, 5 H. & J. 317, 365-66 (1821) ("Whether particular parts of the common law are applicable to our local circumstances and situation, and our general code of laws and jurisprudence, is a question that comes within the province of the courts of justice and is to be decided by them.").[8] Whether or not the alternate modalities of robbery that Dickson puts forward were ever part of Maryland's common law, it is clear that they did not exist at the time that Dickson was convicted of robbery in 2007 and do not exist today.

Maryland's robbery statute provides that "[a] person may not commit or attempt to commit robbery," and that someone who does "is guilty of a felony and on conviction is subject to imprisonment not exceeding 15 years." Md. Code Ann., Crim. Law ("CR") § 3-402 (2002, 2021 Repl. Vol.). Section 3-401(e) of the Criminal Law Article provides,

---

[8] The Court has reaffirmed its authority to modify Maryland common law on many occasions. *See, e.g.*, *Pope v. State*, 284 Md. 309, 341-42 (1979); *State v. Hawkins*, 326 Md. 270, 291-92 (1992) (observing that "[t]he common law is not cast in concrete; it is subject to change by legislative enactment and by judicial decision" and that this Court "has not been reluctant to change the common law").

in pertinent part, that Maryland robbery "retains its judicially determined meaning" except that "robbery includes obtaining the service of another by force or threat of force." *Id.* § 3-401(e)(1).[9] The question thus becomes: What did the General Assembly understand the "judicially determined meaning" of Maryland robbery to be when it codified that judicially determined meaning in 2000?

It is telling that we can find no case in the annals of Maryland legal history in which the State obtained a conviction for robbery based on a threat to property or a threat to accuse the victim of sodomy. Thus, there is no "judicially determined meaning" of Maryland robbery, as stated in a decision issued by this Court, that includes either of the theories proffered by Dickson.

However, the cases are legion in which this Court has identified force or the threat of force as an essential element of a robbery charge. Indeed, as this Court has previously noted, the "hallmark" of robbery that distinguishes it from other forms of theft is that robbery requires "the presence of force or threat of force." *Coles v. State*, 374 Md. 114, 123 (2003); *see also id.* (citing *Spitzinger v. State*, 340 Md. 114, 121 (1995), for the proposition that robbery "is accomplished by violence or putting in fear").[10] Significantly,

---

[9] As noted above, the General Assembly first codified the "judicially determined meaning" of robbery in 2000. It did so by amending Article 27, Section 486, of the Maryland Code. *See* 2000 Md. Laws, Chap. 288, § 1; Md. Code Ann., Art. 27, § 486 (1957, 1996 Repl. Vol., 2000 Supp.). Two years later, as part of Maryland's Code revision project, the robbery definition became part of Section 3-401 of the new Criminal Law Article. *See* 2002 Md. Laws, Chap. 26, § 2; Md. Code Ann., Crim. Law § 3-401 (2002).

[10] In *Coles v. State*, this Court also explained that "[t]he Committee to Revise Article 27, in the Note annotating Art. 27, § 486, identified the 'judicially determined meaning' of robbery referred to in that Section as 'the felonious taking and carrying away of the

20

the Court also consistently required that the property be taken from the victim's "person" or be taken in the victim's "presence." *See, e.g.*, *Foster v. State*, 297 Md. 191, 213 (1983) (stating that robbery is the taking away of "property of another from his person or in his presence by the use of violence or by putting him in fear") (emphasis deleted); *Williams v. State*, 302 Md. 787, 792 (1985) (explaining that Maryland robbery is a common law offense that is defined as the "taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear"); *West*, 312 Md. at 201 (defining robbery in the same language discussed above, and providing a "succinct[]" definition as "larceny from the person, accompanied by violence or putting in fear"); *see also Snowden v. State*, 321 Md. 612, 617-18 (1991); *Smith v. State*, 412 Md. 150, 155 n.1 (2009); *Spencer*, 422 Md. at 428-29; *State v. Stewart*, 464 Md. 296, 319 (2019).

As the largely identical definitions used by the Court in previous cases make clear, the essence of Maryland robbery is the use of "violence" or "putting in fear" to take property from another's "person." Prior opinions of this Court have construed the "putting in fear" language as referring to a threat of physical violence or bodily harm against the person in a manner akin to common law assault. *See Spencer*, 422 Md. at 434 ("[T]his Court has also emphasized that when considering whether there has been a threat of force

---

personal property of another, from his person or in his presence, by violence, or by putting him in fear[.]'" 374 Md. at 123 (footnote and citations omitted). Notably, prior to the definitional codification in 2000, the annotations to Section 486 provided that robbery requires either violence or constructive violence, interpreting the "putting in fear" language in prior judicial decisions as denoting the latter. *See, e.g.*, Md. Code Ann., Art. 27, § 486 (1957); Md. Code Ann., Art. 27, § 486 (1957, 1976 Repl. Vol.); Md. Code Ann., Art. 27, § 486 (1957, 1992 Repl. Vol.); Md. Code Ann., Art. 27, § 486 (1957, 1996 Repl. Vol.); Md. Code Ann., Art. 27, § 486 (1957, 1996 Repl. Vol., 2000 Supp.).

or intimidation, an objective test must be employed. This test should consider whether an ordinary, reasonable person under the circumstances would have been in fear of bodily harm."); *Snowden*, 321 Md. at 617-18 ("Robbery is a compound larceny. It is a larceny from the person accomplished by either an assault (putting in fear) or a battery (violence). Therefore, either combination produces a robbery.").

The "from the person" language used in the taking requirement of Maryland robbery further supports this view, as it contemplates in the ordinary case an element of face-to-face interaction that would reasonably aggravate the severity of the threat. It seems unlikely that a threat to harm a person's property or to accuse the person of sodomy would meaningfully put a person in more "fear" when done in their presence rather than remotely. However, in many instances, a threat of bodily harm will carry more weight when the perpetrator is within striking distance than when he makes the threat without having the ability to cause bodily harm right then and there.

In support of the proposition that Maryland robbery encompasses alternate, non-violent modalities, Dickson cites dicta from two 1970 Court of Special Appeals decisions, *Giles v. State*, 8 Md. App. 721 (1970), and *Douglas v. State*, 9 Md. App. 647 (1970). In *Giles*, the Court of Special Appeals observed that putting someone "in fear" was sufficient to form the basis for a robbery conviction. 8 Md. App. at 723. The court then said that "[t]he fear must be reasonable; it must be of such nature as to excite reasonable apprehension of danger, and reasonably to cause the owner to surrender his property. The fear may be of injury to the person or to property, as for example, a threat to burn down a house." *Id.* In a footnote, the court addressed the subject of fear of harm to reputation,

22

stating that "[a]s a general rule fear of injury to character or reputation is not sufficient" to constitute the fear that can take the place of actual violence in a robbery prosecution. *Id.* at 723 n.1. However, according to the court, there is "a recognized exception": the fear induced by a threat to accuse the victim of sodomy, because sodomy is an "offense … so loathsome that the fear of loss of character from such a charge, however unfounded it may be, is sufficient to reasonably induce a man to give up his property." *Id.* (quoting Clark & Marshall, LAW OF CRIMES 791 (6th ed. 1958)) ("Clark and Marshall").

In *Douglas*, which was decided five months after *Giles*, the intermediate appellate court cited *Giles* for the proposition that the fear required for robbery "may be of injury to the person or to property, as for example, a threat to burn down a house" and also cited the footnote in *Giles* concerning fear of harm to reputation. *Douglas*, 9 Md. App. at 654 (citing *Giles*, 8 Md. App. at 723 & n.1) (internal quotation marks omitted).

Neither *Giles* nor *Douglas* involved a robbery prosecution premised on a threat to harm property or a threat to accuse the victim of sodomy. Neither case cited any Maryland case or treatise in support of the proposition that Maryland robbery includes these alternate modalities. Rather, *Giles* cited only Clark and Marshall, which, in turn, cited the same English cases that we have discussed above, as well as several other non-Maryland cases. *See* Clark & Marshall at 790-91. Dickson cites no other reported cases from the Court of Special Appeals or any case from this Court in which either appellate court has relied on the *Giles* dicta to define robbery as including threats to property or to accuse the victim of sodomy. Nor have we found any such cases in our research. Suffice it to say that *Giles* and *Douglas* do not persuade us that, when the General Assembly amended Article 27, Section

486 in 2000, and referred to the "judicially determined meaning" of robbery, the General Assembly understood that judicially determined meaning to include any non-violent modalities.

We also find it significant that, as part of the codification of robbery in 2000, the General Assembly expanded the scope of robbery under Maryland law, but at the same time made clear that force or the threat of force was an element of this new subspecies of robbery:

> "Robbery" retains its judicially determined meaning except that:
>
> (1) robbery includes obtaining the service of another by force or threat of force…

CR § 3-401(e). Prior to this addition to the law of robbery in Maryland, a person did not commit robbery by obtaining a service. Rather, under Maryland common law, a perpetrator only committed robbery by taking money or goods from the person or presence of another. *See, e.g., West*, 312 Md. at 203-04 (defining robbery as "the felonious and forcible taking from the person of another, of *goods or money* to any value, by violence, or putting him in fear") (emphasis added).

The General Assembly made plain when it expanded the scope of Maryland robbery that obtaining the service of another would only constitute robbery if the perpetrator used "force" or the "threat of force" to compel the victim to provide the service. Dickson argues that the exception to the judicially determined meaning that the General Assembly intended to enact with this provision was an exception to the doctrine that threats to accuse the victim of sodomy can form the basis for a robbery conviction. That is, under Dickson's

interpretation, while the statutory version of Maryland robbery still covers a taking of money or goods by threatening to accuse the victim of sodomy, it does not apply where a person obtains, for example, the use of the victim's home rent-free[11] by threatening to accuse the person of sodomy.

We do not read CR § 3-401(e) as Dickson does. We can think of no reason why the General Assembly would retain threats to accuse victims of sodomy with respect to takings of money or goods and not include the same modality for takings of services. The more logical interpretation of the provision is that the General Assembly believed it was appropriate to bring wrongful obtaining of services within the robbery statute – a change from the prior judicially determined meaning of robbery – but made clear that such conduct only constituted robbery where the perpetrator used force against the person or threatened bodily harm to extract the victim's agreement to provide the service. Having expressed its intent to limit "service robberies" to those committed through the actual or threatened use of force against the person, the General Assembly has provided us with confirmation that, in 2000, it understood the judicially determined meaning of robbery to include the equivalent limitation with respect to takings of money or goods.

---

[11] For purposes of the robbery statute, "service" includes:

    (1) labor or professional service;
    (2) telecommunication, public utility, toll facility, or transportation service;
    (3) lodging, entertainment, or restaurant service; and
    (4) the use of computers, data processing, or other equipment.

CR § 3-401(f).

## IV

## Conclusion

For the reasons discussed above, we answer the Fourth Circuit's Certified Question in the negative and hold that, under Maryland law, an individual cannot be convicted of robbery by means of threatening force against property or threatening to accuse the victim of having committed sodomy.

> **CERTIFIED QUESTION OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY.**