NOT DESIGNATED FOR PUBLICATION

No. 125,947

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID LEE GOLLAHON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; KENDRA S. LEWISON, judge. Submitted without oral argument. Opinion filed January 30, 2026. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before CLINE, P.J., BRUNS and COBLE, JJ.

PER CURIAM: After an incident at a bed and breakfast, David Lee Gollahon was convicted by a Riley County jury of aggravated kidnapping, aggravated burglary, and attempted aggravated robbery. He appeals his convictions and calculation of his sentence, raising multiple issues for our consideration. Finding no error, we affirm his convictions and sentence.

1

FACTUAL AND PROCEDURAL BACKGROUND

At the time of the crimes in question, Debra Ring was an employee of the Valley Scenic Inn (the Inn). As part of her job, she prepared rooms for guests, cleaned the restrooms, and occasionally met guests when owner and manager Diana Nickel was unavailable.

On December 29, 2017, Nickel was expecting guests at the Inn but was ill, so she arranged to have Ring come to the Inn to prepare the rooms while Nickel returned to her bedroom suite. After Ring arrived at work around 1 p.m., she began collecting the necessary supplies. As she did so, Ring turned around to see a man standing in the doorway of the Inn's laundry room. She asked if she could help the man, and he replied that he was wanting to book a room. The man said he did not have the contact information to book by phone or online, so Ring walked toward the entryway to get the information.

As she did so, she looked through the window to the parking lot and noticed a white or silver pickup truck parked next to her red SUV. While getting a card to hand the man, he grabbed her shoulders and forcibly threw her to the floor. Ring landed on her back with the wind almost knocked from her lungs. She began to scream, but the man immediately straddled Ring on his knees and placed his hands around her neck, choking her and threatening her to keep quiet. Ring smelled alcohol on his breath. The man then repeatedly demanded to know where the money was kept, cursing at Ring and telling her to stay. When able, Ring told the man that she did not know anything about any money; she merely worked at the Inn.

After a minute or two, the man pulled her up and asked her to take him to the rooms that were occupied. Ring told her that she just had a note telling her which rooms to clean. The intruder wanted to see the note. Holding her left arm securely with his right

2

hand, he propelled Ring to the kitchen. After reading the note, the man wanted to see the rooms. Ring led the man back through the kitchen and family room to the back of the house, where a stairway led to second-floor bedrooms. The intruder wanted Ring to take him upstairs, but Ring resisted. The man then directed Ring back through the kitchen to the entryway. He never released Ring's arm. As Ring indicated the stairs to the other guest bedrooms, they stopped directly in front of the door to Nickel's bedroom. He asked her what was behind the shut door, and Ring lied and told him she had never been inside that door. The man kicked at the door, causing it to fly open.

Nickel's dog began to bark, and the man backed out of the doorway and pushed Ring towards the powder room, which opened into the entryway. She did not want to enter the room, but the man shoved her inside and threatened to kill her if she did not remain inside. Ring stayed inside the powder room until the police entered the house because of the intruder's threats.

Meanwhile, as Ring's encounter with the man began, Nickel was getting out of the shower when she heard a thud and heard Ring scream. Initially, Nickel believed Ring had fallen, but then she then heard Ring say, "'I have no idea where their valuables are and I've only been here a short while. I'm just here to clean the bedrooms and the bathrooms.'" She also heard a male voice say something. She quietly left the bathroom and locked the bedroom door. She returned to the bathroom and called 911. The 911 dispatch received the call at 1:35 p.m. During the information she gave the dispatcher, she gave information about Ring's physical description and vehicle.

While on the phone with the dispatcher, Nickel heard pounding on the bedroom door, then the bedroom door flew open and hit the bathroom wall. Nickel's dog began barking wildly. Nickel then could hear nothing else outside the bedroom, and she urged the dispatcher to have the police enter the house because she could no longer hear Ring.

3

Riley County Police Officer Jarrod Sheldon was the closest officer to the call. He initially activated his emergency lights and sirens, but, when advised that the suspect might remain at the scene, he deactivated his emergency equipment as he approached the property. As he entered the property, he reached a fork in the road. Not knowing which way to proceed, Officer Sheldon stopped momentarily to obtain direction from dispatch.

A silver pickup truck approached the officer on the road, not traveling fast. Officer Sheldon stopped in the center of the road, exited his patrol vehicle, and waved down the driver. Dispatch had mistakenly believed that Nickel provided a description of the intruder and the intruder's vehicle, although she had described Ring and Ring's vehicle, not having seen the intruder. So, Officer Sheldon believed he was looking for an individual with blonde hair driving a red SUV. Still, the officer began a conversation with the driver, recorded on his body camera, who was subsequently identified as Gollahon. Since Gollahon was wearing coveralls, Officer Sheldon asked if he was working at the property. Gollahon said that he was, that he was helping out, and that he was trying to book a room for himself and his wife. Officer Sheldon asked if Gollahon had seen anything when he was at the Inn. Gollahon replied that he saw nothing and no one because no one answered when he knocked on the door. As they talked, Officer Sheldon detected the odor of alcohol.

Officer Sheldon asked Gollahon to exit his vehicle and place his hands on the truck. Gollahon complied with all the officer's requests. Gollahon was wearing a pair of leather work gloves and pulled them off as he exited the truck.

Officer Sheldon continued to communicate with dispatch and requested Gollahon's identification and noted the truck's tag number. Ultimately, Officer Sheldon released Gollahon because his description did not match the description dispatch mistakenly believed Nickel provided.

4

Officer Sheldon continued down the road to the Inn, which took roughly one minute. On seeing the red SUV—described by dispatch as the suspect's vehicle—in the parking lot, Officer Sheldon began to doubt the information and contacted another officer to stop Gollahon's truck, but the other officer did not see the truck on the way to the Inn.

As other officers arrived, law enforcement entered the house and ultimately encountered Ring and Nickel but found no suspect. As Ring narrated her ordeal, she described the intruder as a white male wearing a knit cap. Although she initially did not provide any physical descriptors, she later added that she smelled alcohol on the intruder's breath and reported the intruder's relative height. When Officer Sheldon mentioned he had stopped a man driving a silver truck leaving the property as he arrived, Ring confirmed that she had seen a white or silver truck through the window near the front door, just before the attack started.

Later in the interview, Officer Sheldon showed a still image of Gollahon from his body camera footage to Ring, and Ring identified Gollahon as the intruder from that image. At trial, Ring remained convinced of the propriety of that identification.

Detectives began a search for Gollahon. They discovered that he was employed with a construction company and confirmed that he was at work on December 29 but left work shortly after lunch, claiming that he felt ill. The other detective contacted Gollahon's wife, obtained Gollahon's phone number, and called Gollahon, asking him to come in for questioning. Though he agreed, Gollahon never appeared. By tracking first Gollahon's cell phone signal and then his wife's after losing Gollahon's signal, detectives learned they were traveling south along backroads, tracing them to Harvey County. The Harvey County Sheriff's Department arrested Gollahon, and when he was searched at the jail, his SIM card was found outside his cellphone.

The State originally charged Gollahon with kidnapping, attempted aggravated robbery, and criminal threat. It later amended the charges several times, finally settling on aggravated kidnapping, aggravated burglary, and attempted aggravated robbery. Following pretrial motions not relevant to this appeal, the case was presented to a jury. The jury returned verdicts of guilty on all counts.

Gollahon filed two pro se motions for new trial which were supplanted by a motion filed by newly appointed counsel. The district court held a non-evidentiary hearing on the motions for new trial but ultimately denied Gollahon relief. Gollahon's attorney then filed a motion for dispositional and/or durational sentencing departure.

At sentencing, the district court overruled Gollahon's objections to his criminal history and scored Gollahon's criminal history as A. The court also denied the departure motion, finding that the mitigating reasons cited by Gollahon did not balance against the offense sufficiently to justify a departure. The court imposed a 620-month sentence with a postrelease supervision term of 36 months for the base offense of aggravated kidnapping. The court imposed a concurrent term of 41 months for aggravated burglary and a 32-month term in prison for attempted aggravated robbery, running it concurrent with the aggravated kidnapping sentence but consecutive to the aggravated burglary sentence. The court also ordered Gollahon's sentence to run consecutive to a federal case.

Gollahon timely appeals. Additional facts will be provided as needed.

ANALYSIS

1. *Evidence legally supported Gollahon's aggravated kidnapping conviction*

Gollahon first challenges his conviction for aggravated kidnapping, reasoning that the taking or confinement of Ring was merely incidental to his commission of the crime

6

of attempted aggravated robbery and not sufficient to support an independent crime of aggravated kidnapping. He frames this as a sufficiency of the evidence issue.

Appellate review of such a challenge is well-established. When a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction, an appellate court reviews the evidence presented at trial in a light most favorable to the prosecution to determine whether a rational factfinder could have concluded that the defendant was guilty beyond a reasonable doubt. In conducting this review, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or determine the credibility of witnesses. An appellate court will reverse a guilty verdict for insufficient evidence when the conviction is based on testimony only when the testimony is so incredible that no reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Ninh*, 320 Kan. 477, 486, 570 P.3d 1169 (2025).

As Gollahon was charged with aggravated kidnapping in this case, the State was required to prove:

"1. The defendant took or confined Debra Ring by force or threat.
"2. The defendant did so with the intent to facilitate flight or the commission of any crime.
"3. Bodily harm was inflicted upon Debra Ring.
"4. This act occurred on or about the 29th day of December, 2017, in Riley County, Kansas."

See K.S.A. 21-5408 (kidnapping/aggravated kidnapping).

Relying on *State v. Buggs*, 219 Kan. 203, 215, 547 P.2d 720 (1976), Gollahon contends that the State's evidence was insufficient to establish that the taking or confinement of Ring facilitated his flight or the commission of another crime because the

7

taking and confinement were merely incidental to the commission of the crime of attempted aggravated robbery.

In *Buggs*, our Supreme Court extensively compared the Kansas kidnapping and aggravated kidnapping statutes with the Model Penal Code and the New Mexico Criminal Code, from which the Kansas statutes were drafted. The court rejected the notion that taking or confinement had any specific duration or location requirements, finding that "it is still the fact, not the distance, of a taking (or the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping." *Buggs*, 219 Kan. at 214. But, because the Legislature placed no temporal or location restrictions on the taking or confinement, the *Buggs* court wrestled with the scope of the subsection of kidnapping defined by the facilitation of flight or the commission of another crime. The court therefore limited the scope of kidnapping when the taking or confinement was related solely to flight from, or the commission of, another crime.

> "We therefore hold that if a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:
> "(a) Must not be slight, inconsequential and merely incidental to the other crime;
> "(b) Must not be of the kind inherent in the nature of the other crime; and
> "(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

While the continued validity of *Buggs* is subject to debate, the Kansas Supreme Court has consistently upheld the analysis. See *State v. Moore*, 319 Kan. 557, 566, 556 P.3d 466 (2024). And we are bound by Kansas Supreme Court precedent. See *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022).

Here, the State presented evidence that Gollahon physically moved—or committed a taking of—Ring by physically propelling her around the house and that he confined her both by limiting her freedom of action in propelling her around the house and by pushing her into the powder room.

## 1.1. *Taking*

To facilitate the commission of a crime under *Buggs*, the taking or confinement must either make the commission of the other crime substantially easier or considerably lessen the risk of detection. *State v. Butler*, 317 Kan. 605, 608, 533 P.3d 1022 (2023); *Buggs*, 219 Kan. at 216. The underlying crimes of commission in this case were aggravated burglary and attempted aggravated robbery. The aggravated burglary was accomplished the moment Gollahon entered the Inn without permission with the intent to commit a theft or felony, and that crime continued so long as Gollahon remained in the Inn without permission. See K.S.A. 2017 Supp. 21-5807(a)(1), (b)(1) (defining aggravated burglary as unauthorized entry or remaining within a dwelling). Accordingly, his movement of Ring around the house did not make it substantially easier for Gollahon to commit the aggravated burglary. See *State v. Larsen*, No. 122,660, 2022 WL 3017317, at *6 (Kan. App. 2022) (unpublished opinion) (confinement after crimes completed did not make commission of crimes substantially easier). Similarly, aggravated robbery required the State to prove Gollahon had the intent to take property from the person or presence of Ring by force or fear. See K.S.A. 21-5420(a). So, his forcibly moving Ring to various parts of the Inn in his search for valuables may be seen as incidental to the crime of attempted aggravated robbery.

Whether the movement of Ring considerably lessened Gollahon's risk of detection is a more difficult question. Arguably, Gollahon could have been located as easily if he had moved throughout the house on his own as he would have been if he dragged Ring along. But, by dragging Ring around the house, Gollahon substantially reduced the risk

9

that Ring would escape into a locked room within the house or escape the house and contact the authorities. In this way, his physical control over Ring as he searched the Inn considerably reduced the risk of his detection, and because he moved Ring to prevent her from contacting the authorities while he searched the Inn, his intent satisfied that part of the aggravated kidnapping statute. See *State v. Kane*, 57 Kan. App. 2d 522, 532, 455 P.3d 811 (2019) (We can conclude "independent significance not only when an act *actually* makes a crime substantially easier to commit but also when the act has the *potential* to do so, even if the defendant never received the anticipated benefit. It is the nature of the act, not its result, that is legally important.").

Accordingly, the circumstances support a conclusion that Gollahon intended to reduce the risk of detection of his crimes by moving Ring around the house, unaware that Nickel was already on the phone with police, so the movement of Ring has independent legal significance supporting Gollahon's conviction for aggravated kidnapping. *Larsen*, 2022 WL 3017317, at *6 (confining the victim in the stairway substantially lessened the defendant's risk of detection by allowing him to escape the residence into a park rather than into the neighborhood).

### 1.2.   *Confinement*

But we need not decide Gollahon's challenge on the evidence of Ring's forced movement through the Inn. His physical restraint of Ring throughout his presence in the Inn and his securing Ring in the powder room constituted confinement. Gollahon's confinement of Ring as they moved about the Inn facilitated the commission of the crime by concealing his crime. Her confinement in the powder room facilitated Gollahon's escape. From the moment Gollahon straddled Ring on the floor until the police entered the house, Ring was continuously confined by Gollahon through physical force or by threat of violence.

10

In *State v. Couch*, 317 Kan. 566, 589, 533 P.3d 630 (2023), the Kansas Supreme Court opined that binding a victim after completing sexual crimes against her did not facilitate the underlying crimes, which were completed, but the court suggested that the act of binding the victim might support aggravated kidnapping to facilitate flight, except the jury was not instructed on this theory.

*State v. Richmond*, 258 Kan. 449, 453, 904 P.2d 974 (1995), provides circumstances more analogous to this case. In *Richmond*, the defendant placed the victim in an unlocked closet and threatened her with violence if she exited. Our Supreme Court found this was sufficient to support confinement for the purpose of facilitating flight from the commission of a crime. The victim was unable to see the defendant, unable to see the defendant's vehicle, and unable to see which direction the defendant traveled when he fled from the residence. Additionally, the victim was delayed in exiting the closet and calling law enforcement to report the home invasion because she did not know when the defendant had gone. 258 Kan. at 454.

Forcing Ring to enter the powder room and remain there by threats of violence constituted confinement that served no purpose other than to facilitate Gollahon's escape, either by delaying Ring's contact with police or by preventing her from accurately reporting the time, direction, and mode of transportation Gollahon used to flee. His confinement of Ring actually did delay his capture because law enforcement received inaccurate information regarding the suspect's description. If Ring had also called 911 as Gollahon left the property, that misinformation might have been corrected.

Interpreting the evidence in a light most favorable to the State, as the court is compelled to do, the confinement, if not the taking, of Ring was sufficiently independent under the *Buggs* analysis to constitute kidnapping. Gollahon's infliction of bodily harm on Ring—which he does not challenge in this appeal—enhanced the crime to aggravated

11

kidnapping. See *State v. McCormick*, 37 Kan. App. 2d 828, 846-47, 159 P.3d 194 (2007) (injuries inflicted on the victim during or after the initial confinement may constitute bodily harm).

2. *No reversible prosecutorial error occurred*

Gollahon next argues that the State committed reversible prosecutorial error in closing arguments by improperly directing the jury how to consider lesser included offenses. Although Gollahon concedes that he did not object to the closing statements at trial, challenges to prosecutorial error during closing argument need not be preserved by a contemporaneous objection at trial. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

In considering a claim of prosecutorial error, an appellate court first determines whether an error occurred. Prosecutorial error in closing arguments occurs when the prosecutor's actions or statements "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016); *Bodine*, 313 Kan. at 406.

The wide latitude afforded to prosecutors encompasses argument and reasonable inferences drawn from the evidence presented at trial so long as the argument or inferences accurately reflect the evidence and accurately state the governing law. Argument may not be designed to inflame the passions of the jury or to otherwise divert the jury from its duty to decide the case on the controlling law as applied to the evidence admitted at trial. In considering whether comments exceeded the scope of permissible argument, the court considers the context in which the comments were made, not in isolation. 313 Kan. at 406-07.

If error occurred, we then consider whether the error prejudiced the defendant's due process right to a fair trial. 313 Kan. at 406. Prosecutorial error is harmless only if the reviewing court is satisfied beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record—that is, if there is no reasonable possibility that the error contributed to the verdict. *Bodine*, 313 Kan. at 406 (citing *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 [2020]; *State v. Chandler*, 307 Kan. 657, 674, 414 P.3d 713 [2018]).

Here, the district court provided its instructions to the jury before the parties made their closing statements. These instructions included several lesser included offense instructions, none of which Gollahon challenges.

But during its closing argument, the State addressed the lesser included offenses generally and suggested that the jury must be unanimous in rejecting the greater charged offense before considering the lesser included offense. The State argued:

> "So ladies and gentlemen, when we start talking about the charges, and we're gonna talk about them right now. Let's talk about the aggravated kidnapping. And you do have some lesser includeds. *You only get to the lesser includeds when 12 of you say, 'You know what? He's not guilty of the top charge.'*" (Emphasis added.)

The State then went through the evidence supporting the elements of aggravated kidnapping before adding, "Again, you only get to the lesser included offense of kidnapping if you don't think he committed what [was] just read to you, but the evidence says he did."

This statement that the jury had to agree could be viewed as error, not because it instructed the jury to consider the greater offense first but because it required the jury to unanimously reject the greater offense before considering the lesser included offense. See

13

*State v. Hudgins*, 301 Kan. 629, 648, 346 P.3d 1062 (2015) (relying heavily on the analysis in *State v. Hurt*, 278 Kan. 676, 681-82, 101 P.3d 1249 [2004]) (analyzing scenarios in which a jury deliberates on higher and lesser included offenses; finding error where the State "informs the jury it cannot consider the lesser included offenses if the jurors disagree with one another, *i.e.*, there is not unanimity"). But even if we presume the comment was erroneous, we must consider whether the error undermined Gollahon's ability to obtain a fair trial, and we ultimately find it did not.

Our prejudice analysis necessarily begins with the law provided to the jury through instructions. First, we presume that the jury followed the instructions provided by the court. *Ninh*, 320 Kan. at 494. Here, the jury was properly instructed that the statements, arguments, and remarks of counsel were not evidence and that any statements not supported by the evidence should be disregarded, and another instruction informed the jurors that their collective decision should be based on application of the instructions to the facts. And, for each of the lesser included offenses, the jury was provided the pattern instruction, advising it that "[i]f [the jury does] not agree that the defendant is guilty of [the charged offense], [the jury] should then consider the lesser included offense of kidnapping." The court also advised the jury that, if the jury had reasonable doubt as to which of the two offenses—the greater or lesser included offenses—the defendant was guilty of committing, the jury should convict of the lesser offense only. Taken collectively, these instructions properly advised the jury how it could consider lesser included offenses—Gollahon does not argue otherwise—and we presume the jury did so.

Even if the State's instructions on dealing with lesser included offenses could be reconciled with the court's jury instructions so that the presumption does not eliminate the potential prejudice, the jury's adoption of the State's method of considering lesser included offenses eliminates only the second of the three options discussed by the *Hudgins* court—it eliminated the possibility that the jury would reach the lesser included offense based on disagreement between the jurors. 301 Kan. at 648.

14

Eliminating the second consideration, however, leaves only two possibilities. First, the jury could have unanimously agreed on Gollahon's guilt as to the greater offense. In this case, Gollahon can establish no possibility of prejudice. Second, the jury could unanimously agree that the defendant is not guilty of the primary offense. Again, Gollahon could establish no prejudice because, presumably, if the jurors unanimously agreed that Gollahon was not guilty of the greater offenses, they would have returned a verdict on the lesser included offenses (which they would have considered after unanimously rejecting the greater offenses) or they would have returned a verdict of acquittal on the related charges. In the words of *Hudgins*, if the jury had followed the argument of the State in resolving the lesser included offenses but had disagreement on whether Gollahon had committed the greater offense, the jury would have deadlocked and caused a mistrial. *Hudgins*, 301 Kan. at 648-49 ("In other words, a jury of mixed conclusions would simply deadlock without trying to reach agreement on a lesser included offense.").

Here, the jury unanimously returned guilty verdicts on every charged offense. The jury was polled, and each juror affirmed that the verdict reflected his or her decision. Under these circumstances, there is no reason to believe that one or more jurors remained convinced of Gollahon's innocence as to the greater charged offenses. To the extent that a juror originally had doubts about one or more elements of the greater offenses, the fact that he or she was persuaded to eliminate those doubts is part of the jury deliberation process. If his or her doubts were not allayed by the deliberations, he or she should have returned an individual vote for acquittal, and the jury should have returned a non-unanimous decision resulting in a mistrial. None of this occurred.

Finally, in examining the prejudice caused by similar prosecutorial comments in closing, the Kansas Supreme Court in *Hudgins* noted the direct and overwhelming evidence presented in the case. 301 Kan. at 649. Here, Gollahon essentially admitted to being the intruder on his ride back to Riley County after being picked up by detectives in

15

Harvey County. Gollahon's statement resolved any juror doubt as to the identity of the intruder. Ring's testimony provided the remaining evidence for the convictions.

Ring's testimony supported aggravated kidnapping. The distinguishing element between kidnapping and aggravated kidnapping (as well as between robbery and aggravated robbery) is the infliction of bodily harm. See K.S.A. 21-5408; K.S.A. 21-5420. Because "bodily harm" has no specified legal meaning, it was within the province of the jury to determine whether Ring's injuries constituted bodily harm. See *State v. Hambright*, 318 Kan. 603, 610, 545 P.3d 605 (2024) (approving district court's refusal to provide definitional instruction for "dagger" because the Legislature intended the word to carry its common meaning). "'[U]nnecessary acts of violence upon the victim, and those occurring after the initial abduction'" constitute bodily harm. *State v. Mason*, 250 Kan. 393, 397, 827 P.2d 748 (1992).

Here, viewing the evidence in a light most favorable to the State, Ring was thrown to her back, almost knocking the wind from her lungs. Gollahon then straddled her and put his hands around her neck, choking her and leaving red marks on her neck and shoulders. Typically, evidence of severe choking is sufficient to sustain a finding of great bodily harm. See *State v. Curreri*, 42 Kan. App. 2d 460, 465-66, 213 P.3d 1084 (2009); *State v. Tisdale*, 30 Kan. App. 2d 524, 525-26, 43 P.3d 835 (2002). So, if severe choking is great bodily harm, then moderate choking constitutes bodily harm. Neither the act of throwing Ring to the ground nor the act of choking her were necessary to her abduction or to remove property from her person or presence, as demonstrated by Gollahon's later control over her as he moved about the Inn.

Under these circumstances, we find that the prosecutorial error, if any, had no effect on the jury's deliberations beyond a reasonable doubt.

16

3. *The district court did not err in classifying Gollahon's prior Maryland conviction.*

Gollahon's third appellate challenge involves the inclusion of a 1981 Maryland conviction for attempted robbery with a deadly weapon as a person felony in his criminal history calculation.

Gollahon committed the Maryland offense on August 18, 1980, and was convicted in 1981. In his objections to his criminal history, Gollahon objected to the inclusion of the 1981 attempted robbery conviction based on the lack of certified documents establishing the conviction, not on its classification, and he ultimately withdrew the challenge.

Even so, Gollahon correctly contends that we may consider the issue for the first time on appeal. *State v. Dickey*, 301 Kan. 1018, Syl. ¶ 3, 350 P.3d 1054 (2015) (a stipulation or lack of an objection regarding how those convictions should be classified or counted as a matter of law for the purpose of determining the defendant's criminal history score will not prevent a subsequent challenge under K.S.A. 22-3504[1] of his or her prior convictions). The classification of a prior conviction in a defendant's criminal history involves the interpretation of the Kansas Sentencing Guidelines Act—a question of law over which we have unlimited review. *State v. Keel*, 302 Kan. 560, 571, 357 P.3d 251 (2015).

At the time Gollahon committed the offenses in this case, the court determined the classification of a prior out-of-state conviction by first applying the convicting jurisdiction's classification of the conviction as a felony or misdemeanor. *State v. Samuels*, 313 Kan. 876, 879, 492 P.3d 404 (2021) (citing K.S.A. 2017 Supp. 21-6811[e][2]). Next, the sentencing court classified the out-of-state conviction as either a person or nonperson offense by comparing the elements of the out-of-state crime to Kansas crimes and considering how Kansas classified comparable crimes. "'If the state of

17

Kansas does not have a comparable offense in effect on the date the current crime of conviction was committed, the out-of-state crime shall be classified as a nonperson crime.'" 313 Kan. at 879 (quoting K.S.A. 2017 Supp. 21-6811[e][3]).

Before 2000, robbery in Maryland was a common law offense with differing statutory penalties depending on whether the crime was committed with a deadly weapon. *Williams v. State*, 220 Md. App. 27, 32-33, 102 A.3d 814 (2014). At common law, robbery was a felony. *Robinson v. State*, 4 Md. App. 515, 523 n.3, 243 A.2d 879 (1968). Accordingly, the district court properly classified Gollahon's prior 1981 Maryland conviction as a felony.

At common law, robbery was defined as "'the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear.'" *Metheny v. State*, 359 Md. 576, 605, 755 A.2d 1088 (2000). When compared to Kansas' statutory definition of robbery, it is apparent that Kansas' iteration of the offense is broader. First, Kansas defines the basic crime or robbery to include the removal of property from the *person* or *presence* of another. At common law, the offense required removal of property from the person. Second, at common law, armed robbery or robbery with a deadly weapon was simply robbery committed with a deadly weapon. Under Kansas law, aggravated robbery encompasses additional wrongful acts in the commission of the robbery, such as inflicting bodily harm, and committing the robbery with a *dangerous* weapon, which might include weapons not considered to be deadly.

Citing *Giles v. State*, 8 Md. App. 721, 723, 261 A.2d 806 (1970), and *Douglas v. State*, 9 Md. App. 647, 654, 267 A.2d 291 (1970) (citing *Giles*), Gollahon argues that robbery under Maryland law would include threats to property, whereas Kansas law required robbery to be committed by force or threat of bodily harm. See K.S.A. 21-5420(a). Gollahon therefore argues that the Maryland conviction for attempted robbery

18

with a deadly weapon could encompass conduct that is not criminalized by Kansas law, requiring the district court to classify the Maryland conviction as a nonperson felony.

While *Douglas* and *Giles* include language that potentially defined robbery to encompass threats to property as well as threats of violence, the Maryland Supreme Court has since rejected this language and limited the scope of common-law robbery to threats to the person. *Dickson v. United States*, 478 Md. 255, 262, 274 A.3d 366 (2022). In reaching its decision, the Maryland Supreme Court specifically declined to ascribe any authority to the two cases Gollahon relies on, finding their statements about threats to property dicta because neither case involved threats to property. *Dickson*, 478 Md. at 276-77.

As a result, *Dickson* derails Gollahon's argument about the more expansive definition of robbery under Maryland law in 1980. At that time, Maryland used the common-law definition of robbery, which was not broader than Kansas' statutory definition. The district court did not err in classifying the 1981 Maryland attempted robbery with a deadly weapon conviction as a person felony in Gollahon's criminal history.

4. *We lack information to consider whether the district court erred in awarding Gollahon his jail time credit.*

Gollahon's final argument challenges the district court's award of jail time credit. Gollahon concedes that he did not raise this issue in the district court. Typically, an appellate court does not consider an issue raised for the first time on appeal. *State v. Mendez*, 319 Kan. 718, 730, 559 P.3d 792 (2024). Kansas appellate courts, however, have recognized exceptions to this general rule. Gollahon has invoked one of these exceptions—an issue of law on undisputed facts—for part of the jail time credit challenges he has raised. But he also concedes that some of the facts related to his request

19

for jail time credit cannot be resolved by review of the appellate record. Accordingly, he urges this court to reverse and remand the case to the district court for resolution of these facts.

Even on challenges to jail time credit that fall within a recognized exception, an appellate court possesses discretion in choosing to consider an unpreserved issue. An appellate court abuses that discretion in invoking an exception to consider an issue that is not amenable to resolution on appeal because of an insufficient record. *State v. Unruh*, 320 Kan. 260, 265, 565 P.3d 825 (2025). Gollahon acknowledges that the appellate record is insufficient to resolve some of his claims but asks this court to exercise its discretion to review the claims, anyway, and remand the case to the district court for consideration of the claims that require additional factfinding.

But as directed by our Supreme Court in *Unruh*, consideration of any of the jail-time credit issues for the first time on appeal could constitute an abuse of judicial discretion. The appellate courts are error-correcting courts, not tribunals for determining facts. *Washburn South Apartments, LLC v. Zou*, No. 126,735, 2024 WL 3219242, at *4 (Kan. App.) (unpublished opinion), *rev. denied* 319 Kan. 837 (2024). An appellant bears the burden of designating a record sufficient to establish a claimed error. Without an adequate record, the claim of error fails. *State v. McNeal*, 320 Kan. 818, 828, 572 P.3d 777 (2025).

By Gollahon's own admission, some of his challenges fail in this appeal for an inadequate record. Because some of the claims require factfinding by the district court, judicial efficiency is better served by allowing the district court to consider all Gollahon's jail-time credit arguments in the first instance. Accordingly, we exercise our discretion to decline to consider Gollahon's unpreserved jail-time credit issue and dismiss this issue as improperly preserved.

Affirmed.